LUTHER McCOY and VELMA DAGLEY, Respondents, v. RALPH S. McCOY, EFFIE ISENHOUR, LENA O. McGINNIS, JESSE C. McCOY, WILLIE C. DRONBERGER, MARY JANACARO, AUGUST McCOY and LESTER M. McCOY, Appellants, ADA McCOY and LESTER EUGENE DAGLEY, Third Party Defendants and Respondents, No. 41378—227 S. W. (2d) 698.

Division One, March 13, 1950.

*Robert L. Holder* and *Charles V. Garnett* for appellants.

*Arthur R. Kincaid, Francis G. Hale* and *Robert E. Coleberd* for respondents; *D. R. Clevenger* and *Lawson, Hale & Coleberd* of counsel.

CONKLING, J.—Charles D. McCoy (herein called grantor) was the father of ten children. Two of his children, Luther McCoy and Velma Dagley, respondents here and plaintiffs below, together with their spouses, were the grantees in the two certain deeds from grantor which are in issue here. The other eight children of grantor, appellants here, were defendants below. Ada McCoy, wife of Luther McCoy, and Lester Eugene Dagley, husband of Velma Dagley were joined as third party defendants because they were also grantees in the two above mentioned deeds.

Respondents sued appellants to partition a certain 40 acres of land in Clay County. Appellants filed a cross-petition praying the cancellation (upon the grounds of mental incapacity and undue influence) of the two above mentioned deeds executed by grantor. Upon change of venue to Platte County the above issues were tried. The chancellor's decree upheld the validity of the two deeds. This appeal is from that decree. No issues were joined on the original petition praying partition. That petition prayed partition of a certain 40 acre tract. But the deeds in issue here purported to convey to respondents and their spouses a certain and different 49 acre tract and a certain 10 acre tract, all in Clay County, Missouri. The original 40 acre tract was sold by agreement of all the parties.

Grantor died in October, 1946 at the age of about 80 years. His wife had died in 1943. By the deed dated January 7, 1946 he conveyed to Luther McCoy and Ada McCoy the 10 acre tract for $10 and other valuable consideration. That deed was acknowledged January 10,

1946, and was recorded January 15, 1946. On January 10, 1946 grantor signed a check for $3900 payable to Velma Dagley. On January 24, 1946, grantor executed and acknowledged the deed conveying the 49 acres to respondents and their spouses. That deed recited that the property conveyed was a gift. That deed was recorded January 24, 1946. These deeds were on printed forms. They were filled in on a typewriter. The identity of the scrivener does not appear in the transcript.

It is here contended by appellants that (1) evidence of grantor's unsoundness of mind is abundant and convincing, and (2) the evidence shows "the existence of a fiduciary relation between the grantees and the grantor coupled with uncontradicted evidence of participation of grantees in execution of the deeds, thus creating the presumption of undue influence, which the evidence does not overcome". Respondents contend that the record evidence shows the contrary. With his decree the chancellor filed an opinion. Among other things, he stated therein that, "* * * to justify setting aside deeds, it must be shown by a preponderance of the evidence that grantor's mental faculties were so impaired that he did not understand the extent of his property and the just claim of his children upon his bounty. All this must be established by evidence which to the mind of the Court is clear, cogent and convincing. I am unable to find this burden has been met. * * * The case for undue influence seems to rest entirely upon the fact that Charles D. McCoy lived with the two children whom he named as grantees".

In view of the trial court's ruling and the instant contentions of appellants a full statement of facts is required.

Grantor with his wife and children had lived on a farm near Missouri City, Missouri. After the children were grown all of them married, moved away and established homes of their own. After the death of his wife in 1943, grantor moved into the home of his daughter, Velma Dagley, who lived in Mosby, Missouri. Except for infrequent intervals grantor lived with her and her husband until his death in October, 1946. He was living there when these deeds were executed.

In 1945 grantor had high blood pressure. Between April 2, 1945, and November 13, 1945, Dr. T. C. Krings, a chiropractor of Excelsior Springs, gave grantor 62 office treatments for that condition. That doctor testified grantor complained of dizziness, was uncooperative and seemed to lack power of orientation; but that those things were not particularly unusual for one of grantor's age and in his condition. Over objection this doctor testified that it was his opinion during that period, "That he (grantor) was not of sound mind", but he did not report that conclusion to grantor's family or to any one in authority. Dr. John F. Grace, a physician of Excelsior Springs (seven miles from Mosby) attended grantor from 1941 until February, 1945. He testified that in 1943 and 1944 grantor was of sound mind. Grantor was suffering from arteriosclerosis. That doctor testified that when he saw

grantor in February, 1945 the latter was then "of unsound mind". This doctor saw grantor also on July 28, 1946, and the latter was then in worse physical and mental condition than in 1945.

In February, 1945, for ten days grantor was a patient in the Osteopathic Hospital in Kansas City and was there treated by Dr. Clyde Smith, an osteopath of Liberty. Grantor then had a "coma and high fever * * * he had a bronchial pneumonia". He recovered from that ailment. Doctor Smith saw grantor again on the day before his death. For the period prior to grantor's hospitalization Doctor Smith diagnosed grantor's condition as senile dementia. When asked how often he saw grantor professionally after February 25, 1945, and up to the time of grantor's death, Doctor Smith replied, "Well, it was kind of spotty. By that I mean I would say I saw him maybe two or three times one week; then I had no occasion to see him maybe for several months or something, just when the family called me". He testified grantor's condition became "progressively worse" but nothing appears in the record that this witness saw grantor (or knew what his condition was) in January, 1946, or at any certain time after February 25, 1945, until in July, 1946.

The operator of an Excelsior Springs nursing home, wherein grantor was an ambulatory patient for nine days in April, 1945, testified grantor "wasn't of sound mind at that time". Ralph McCoy, of Kansas City, Kansas, an appellant here and a son of grantor, did not see his father between June, 1945 and May, 1946. When asked if in 1945 he formed any opinion as to whether grantor was "mentally sound", Ralph replied, "Well, I don't think he was". Jesse McCoy, another son, saw grantor three or four times after the latter was at Mrs. Dagley's home, and last saw him there about the middle of September, 1945. This son testified his father did not know him (Jesse) and that there were times grantor "didn't know what he was doing". Over objection this son testified he thought grantor of unsound mind.

Mrs. Dronberger, grantor's daughter, testified that she and her husband visited grantor at the Osteopathic Hospital in February, 1945; that grantor did not then recognize her husband and did not know where he (grantor) then was; and that in the fall of 1945 at Mrs. Dagley's home grantor failed to recognize her. Mrs. Isenhour, another daughter, also testified but her testimony shed no light at all upon this issue. Maud McCoy, wife of appellant Jesse McCoy, testified she last saw grantor in September, 1945, and on that occasion grantor failed to recognize her husband; that in September, 1946 grantor was quite ill; that during the period from 1944 up to January, 1946 "his (grantor's) mind was definitely unsound on various subjects. I wouldn't state that the man was insane for I am not competent to do that, but his mind was definitely not working right at all times."

 As to the testimony of the above mentioned lay witnesses, we point to the rule that mental incompetency cannot be established by

such a witness, where, as here, the lay witness did not first relate sufficient facts upon which to base the opinion of such incompetency. When the facts relied on have been stated by a lay witness, those stated facts must be inconsistent with mental competency. Lee v. Ullery, 346 Mo. 236, 244, 140 S. W. (2d) 5.

Frank R. Hull, Vice-President of the Excelsior Trust Company, of Excelsior Springs, on January 10, 1946, went to the Dagley home and took grantor's acknowledgment of the above mentioned deed to the 10 acre tract. He went there at the request of Eugene Dagley, husband of Velma Dagley. He conversed with grantor who fully understood what the deed was and what it conveyed. He testified that grantor stated that was what he wanted to do and knew what he (grantor) was signing; that grantor sat at a table, and looked like he had been ill but acknowledged the execution of the deed was his (grantor's) free act and deed; and that grantor was then of sound mind. Mr. Hull and his son also signed the deed as witnesses. J. C. Shelton, a real estate man in Excelsior Springs, who had known grantor all his life, took grantor's acknowledgment to the other deed on January 24, 1946; that on that occasion there was nothing unusual about grantor's conversation; there were no peculiarities about grantor, who, at that time, was of sound mind.

The testimony of some thirteen witnesses, who had various contacts with grantor tended to establish his sanity. Of these, one was an insurance agent who saw grantor regularly at the Dagley home; another witness was employed in the Dagley home one day a week; another witness purchased grantor's corn in the fall of 1945; another witness visited with grantor once a week (and sometimes took him riding) from October, 1945 to October, 1946; another witness saw grantor every few days when the latter lived in Mosby. It is not important to the issue presented here to detail all the ▇▇ testimony tending to establish soundness of mind. Mrs. Lena Curry, a neighbor in Mosby, who was a witness to the execution and acknowledgment of the deed of January 24, 1946, saw and talked with grantor on many prior occasions; she testified grantor was then of sound mind, and that on that occasion, after the deed was signed, grantor stated "he had been intending to do that a long time, but he had just about waited too long to do that."

Other than as set out above there was no testimony at all as to grantor's mental condition at the time of the execution of the two deeds in question.

Upon the question of undue influence it appears from the transcript that after grantor moved into Mrs. Dagley's home he paid Mrs. Dagley twenty dollars a week for his board, room, washing, care, etc. Mrs. Dagley took care of her father. Some of the time (but the dates of those occasions do not definitely appear) grantor was ill in bed. Luther McCoy looked "after his father's business". Grantor had "turn-

ed everything (grantor's business) over to him" (Luther). Luther (or his wife) or Mrs. Dagley and her husband, looked after grantor and called a doctor for him when he needed one. When his father was in the Osteopathic Hospital, Luther stayed with him, "* * * he (Luther) sat there with him the night they took him to the hospital. Practically every day, he (Luther) was there when he was sick with pneumonia". The witness Fancher, who purchased some corn from grantor in the fall of 1945, testified that Luther McCoy was present on that occasion, "because the father (grantor) said he wanted to be sure that I was paying the right price for the corn". Fancher testified that he paid Luther McCoy for the corn he purchased from grantor.

This is an equity case and we cannot avoid the duty and responsibility placed upon us to reach our own conclusions as to the weight and value of the evidence. We do this, however, with deference to the findings of the trial chancellor because his findings are based not only upon the evidence, but, in addition thereto, he saw and heard the witnesses and observed their demeanor when before him. Mo. R. S. A. § 847.114, Lynn v. Coates, (Mo. Sup.) 142 S. W. (2d) 1014. "This rule of deference to the findings of the chancellor is one of necessity and convenience, and, while always limited to the conditions of the testimony in each particular case, is not to be ignored, unless the proof adduced is palpably insufficient to sustain the findings, or there is a strong preponderance of the evidence to show that the court should have found to the contrary". Daudt v. Steiert, (Mo. Sup.) 205 S. W. 222, Niehaus v. Madden, 348 Mo. 770, 155 S. W. (2d) 141, 145, Edinger v. Kratzer, (Mo. Sup.) 175 S. W. (2d) 807, Shepard v. Shepard, 353 Mo. 1057, 186 S. W. (2d) 472, 474.

We approach this character of case mindful, also, that "the cancellation of a deed is the exercise 'of the most extraordinary power of a court of equity, which ought not to be exercised except in a clear case', Lastofka v. Lastofka, 339 Mo. 770, 99 S. W. (2d) 46, 1. c. 54, and the evidence to justify cancellation should be clear, cogent, and convincing". Edinger v. Kratzer, supra, Hedrick v. Hedrick, 350 Mo. 716, 168 S. W. (2d) 69, Hamilton v. Steininger, 350 Mo. 698, 168 S. W. (2d) 59. And, where as here, it is sought to set aside a voluntary deed because grantor lacked the mental capacity to execute a valid instrument of conveyance to his property, the burden is upon those who seek to have it set aside to establish that *at the time of its execution* grantor lacked such mental capacity. Lastofka v. Lastofka, supra, Masterson v. Sheahan, (Mo Sup.) 186 S. W. 524, 526, Whitacre v. Kelly, 345 Mo. 489, 134 S. W. (2d) 121.

With respect to the mental capacity of grantor, the legal test applied under these circumstances is the same as that applied to the execution of wills. The test is whether grantor had enough mental capacity, at the time of the execution, "to understand the nature of the particular transaction, and did (grantor), with such

understanding, voluntarily enter into and consummate the transaction". McFarland v. Brown, (Mo. Sup.) 193 S. W. 800, Jones v. Thomas, 218 Mo. 508, 117 S. W. 1177, Vining v. Ramage, 319 Mo. 65, 3 S. W. (2d) 712, Lastofka v. Lastofka, supra, Whitacre v. Kelly, supra. The law differentiates between the mental capacity required of grantor making a deed as a part of the arms-length business transaction and the mental capacity required when grantor is receiving but the satisfaction of heart and mind which comes from benefitting those near and dear to him. In the latter instance if he has sufficient mental capacity to know the extent of his property, his relatives and their respective claims on his bounty, the demands of the law have been satisfied. Hedrick v. Hedrick, supra, Curtis v. Alexander, (Mo. Sup.) 257 S. W. 432.

 In support of their contention that under the instant facts, and in these circumstances we should rule that the chancellor "did not reach the correct decision", it is urged by appellants that each medical witness, "testified to the grantor's unsoundness of mind". Assuming that to be true, we find in this record no evidence at all of any unsoundness of grantor's mind at the time of the execution of either of these two deeds. And unsoundness of mind at *that* time must be shown.

But mere proof of illnesses, or imperfect memory, or forgetfulness of names and persons, or old age with its attendant physical and intellectual weaknesses, or mental 'confusion, or arteriosclerosis, either singly or in combination, unless it further appears that grantor did not understand the nature of the instant transactions, and did not with such understanding voluntarily enter into and consummate the transactions, are insufficient to invalidate these deeds. Adams v. Simpson, 358 Mo. 168, 213 S. W. (2d) 908, 911, and cases there cited. Appellants contend, however, that inasmuch as there was testimony by an osteopath that in February, 1945; and prior, grantor had senile dementia which became "progressively worse", and that that witness saw grantor at "spotty" times thereafter (but sometimes not for several consecutive months) that, of necessity, upon that status of the record evidence the chancellor "did not reach the correct decision", and we should reverse him. We are cited to Moll v. Pollack, 319 Mo. 744, 8 S. W. (2d) 38, 44, and to Pickett v. Cooper, 354 Mo. 910, 192 S. W. (2d) 412.

Those cited cases were each actions at law to contest a will for lack of testamentary capacity. The question before us in those cases was whether the evidence of senile dementia in those records was sufficient to make a jury issue of testamentary incapacity at the time of the execution of those wills. There the juries found for contestants and proponents upon appeal here contended there was no evidence of testamentary incapacity sufficient to make a jury question

But a very different situation is presented to us upon this appeal. In the Moll and Pickett cases the evidence had to be viewed by us in its light most favorable to contestants. In those cases the question was not (as it is here) that of the weight of the evidence, or whether the proof adduced is palpably insufficient to sustain the chancellor's findings, or whether there is a strong enough preponderance of the evidence to show the chancellor should have reached a contrary conclusion. The Moll and Pickett cases, cited by appellants, are not authoritative under the instant circumstances.

Other than inferences which we may draw from the osteopath's testimony that in February, 1945 grantor had senile dementia, this entire testimony contains neither fact nor inference as to grantor's mental incapacity to execute these two deeds, at the time they were executed in January, 1946. On the other hand, there is affirmative first hand testimony of eye-witnesses here that at the time the deeds were drawn grantor had sufficient mental capacity to execute them. Certainly, from this evidence, and giving due deference to the superior advantage the trial chancellor had to observe and hear the testimony of those who witnessed the execution of the deeds, and to determine the credibility of those witnesses, we cannot hold that proof advanced before the chancellor was "palpably insufficient" to sustain his findings. We do not see how, upon this proof, the chancellor could have reached a contrary conclusion upon this issue.

But appellants contend that the circumstance that respondents Luther McCoy ▋ and Velma Dagley did not testify is such an "important factor" as to tip the scale in appellants' favor and compel us to reach the contrary conclusion from that reached by the chancellor. Appellants so contend because some of the appellant brothers and sisters testified that respondents Luther and Velma stated to some of the appellants that grantor was "crazy", "crazy as hell", and "crazier than hell", that it was the duty of Luther and Velma "to deny that testimony"; that from their failure to testify in that respect there arises such an unfavorable inference as should aid us "in determining the very right of the matter"; and should compel our finding for appellants. We are cited to Russell v. Franks, 343 Mo. 159, 120 S. W. (2d) 37, 41. We do not agree with this contention. Assuming that those words in fact were used by respondents respecting grantor, we know that "crazy as hell" is an indefinite, loosely applied and carelessly used expression.

We do not find testimony from any one that it is claimed that either Luther or Velma ever said that grantor was "crazy as hell" at or anywhere near the time of the execution of the deeds, or with respect to the execution of the deeds. While not always a flattering characterization, unfortunately these expressions are not uncommon. Language should be more temperate and more choice, but frequently it is not. On the other hand those words are not necessarily derogatory. Some-

times they are used to mean that the person about whom they are spoken has reached an illogical conclusion, but with no intended reflection whatever on his mental capacity. They may be wholly idiomatic or colloquial in character, and are generally so used. If the record showed (which it does not) that respondents (or either of them) had said grantor was "crazy as hell" at the time he executed the deeds in question, and if there was no *other* testimony in the record as to grantor's mental condition at the time of the execution of the deeds, there possibly might be some substance in appellants' instant contention. But here there was no failure "to call other witnesses within his (respondent's) power who have knowledge of such facts and circumstances" (the execution of the deeds) as those words are used in Russell v. Franks, 120 S. W. (2d) l. c. 41. Upon the state of this record, the mere failure of respondents, Luther and Velma, to testify does not necessarily determine "the very right of the matter". Nor do we feel that because of their failure to testify we should hold that, under the instant record, the chancellor was not justified in ruling the question of mental competency as he did rule it. We think his ruling in that respect was correct.

■ As to undue influence. Appellants contend that inasmuch as grantor lived with Mrs. Dagley and that Luther McCoy looked after his father's business, those facts, when coupled with what appellants denominate as "uncontradicted evidence of (respondents) participation", give rise to a presumption of undue influence. It is contended by appellants that the facts mentioned above unequivocally give rise to the existence of a confidential relationship. Whether it does or not we need not decide. (See and compare, Horn v. Owens, (Mo. Sup.) 171 S. W. (2d) 585) But if it does, a presumption of undue influence does not arise from confidential relationship alone. Loehr v. Starke, 332 Mo. 131, 56 S. W. (2d) 772, Larkin v. Larkin, (Mo. Sup.) 119 S. W. (2d) 351, Ulrich v. Zimmerman, 349 Mo. 772, 163 S. W. (2d) 567. In that last case we said: "To raise a presumption of undue influence, as contended for by plaintiffs, there must be both confidential relationship and facts and circumstances tending to show undue influence. Loehr v. Starke (supra) * * *. Of course, undue influence may be inferred from facts and circumstances, but mere suspicion of or opportunity for undue influence are insufficient. Fessler v. Fessler, 332 Mo. 655, 60 S. W. (2d) 17, 23".

■ But appellants contend that here, to couple with their claimed evidence of confidential relationship, there is "uncontradicted evidence of the participation of grantees in the execution of the deeds". Appellants' brief does not point to such evidence, but, in their brief appellants rest on their ipse dixit that, "the evidence of the active participation of the grantees in the execution of the deeds is glaringly apparent". At another ■ place in appellants' brief it is said that "the evidence is abundant and overwhelming that the grantees in

these two deeds took advantage of the age, physical and mental deterioration of their father, *at the opportunity offered them* by reason of the fiduciary relationship * * * to gain an undue advantage over the other heirs'', etc. (Emphasis ours) But no evidence of participation (active, glaring or otherwise) of the grantees in the execution of the deeds, is pointed out by appellants.

We more closely examine the evidence. Frank Hull, who took grantor's acknowledgment to the deed of January 10, 1946, testified that at the request of Eugene Dagley he went to the Dagley home to take that acknowledgment. Frank Hull, his son A. M. Hull, and Velma (Duffle) Dagley signed that deed as witnesses to grantor's signature. Either Mr. or Mrs. Dagley told Mr. Hull that grantor could not write his name. He signed by ''mark''. Other than as herein-above set out, no other facts appear.

As to the deed dated January 24, 1946, the acknowledgment was taken by J. C. Shelton. It was witnessed by Mrs. Lena Curry, a neighbor who lived across the street, and who had visited often with grantor. She testified that Eugene Dagley asked her to come over to witness a signature; that present on that occasion were Judge Shelton (who took the acknowledgment), Luther McCoy, Mr. and Mrs. Dagley, herself, grantor and the little children. No facts, other than as hereinabove set out appear.

As to either deed are there any facts, or inferences which may be drawn, which will establish respondents' participation (in the execution of the deeds) to the extent of even raising an inference of undue influence? ''Undue influence'' is such influence over the grantor as in law is considered to be force, coercion or over-persuasion and which destroys the will power or free agency to act of the grantor. Walter v. Alt, 348 Mo. 53, 152 S. W. (2d) 135, Lastofka v. Lastofka, supra. To be effectual to invalidate these deeds undue influence must have been present in active exercise at the time of their execution, and in such potency that the deeds are not the deeds of grantor but the deeds of the person who was exercising the undue influence. Lastofka v. Lastofka, supra, Beckmann v. Beckmann, 331 Mo. 133, 52 S. W. (2d) 818. Mere natural influence of attachment or love or even a desire to gratify the wish of a loved one is not undue influence and is not banned by the law. Lastofka v. Lastofka, supra, Kadderly v. Vossbrink, (Mo. Sup.) 149 S. W. (2d) 869, Ruff v. Young, 354 Mo. 506, 190 S. W. (2d) 208. To invalidate deeds such as these, there must be substantial evidence, or legal inference from record facts, that undue influence was present in active exercise and caused or assisted in causing the execution of the particular deeds. Lastofka v. Lastofka, supra, Gibony v. Foster, 230 Mo. 106, 137, 130 S. W. 314, Walter v. Alt, supra, Ruff v. Young, supra. Undue influence cannot be based upon speculation or conjecture and cannot be inferred from mere suspicion or opportunity to exercise it. Lastofka v. Lastofka, supra. Tecken-

brock v. McLaughlin, 209 Mo. 553, 108 S. W. 46, Walter v. Alt, supra. That by the execution of a deed a grantor is apparently preferring one heir over another of the same class gives rise to no inference of undue influence. Kadderly v. Vossbrink, supra, Larkin v. Larkin, supra. An advancement or a gift made by grantor to a grantee during the lifetime of grantor does not raise an inference of undue influence. Winn v. Grier, 217 Mo. 420, 117 S. W. 48, 60.

When the applicable principles are laid against the instant facts, what conclusion do they compel? We concede undue influence need not be shown by direct evidence. May undue influence be inferred from any of these facts? If it were conceded, without so deciding, that inasmuch as grantor in his days of need for the companionship of a loved one lived in the home and was beneficiary of the care and affection of one grantee; and that another grantee, a son, took care of his business, and that therefore a confidential relationship did exist, even then, upon those facts alone no inference of undue influence can arise. Loehr v. Starke, supra. More is ▆▆▆▆ required than that. Bockting v. Bockting, 358 Mo. 893, 217 S. W. (2d) 538.

Do the record facts respecting the execution of these deeds, singly or in any combination, even when considered with what appellants contend is a confidential relationship, warrant the inference of undue influence? We do not think so. Neither the mere fact that either grantee, or both together, had the opportunity to persuade grantor to execute these deeds, nor the further fact that appellants suspect grantees of having done so (and in their cross-petitions charge them with it) raises the inference of undue influence. Neither the fact that, as to the first deed, Mr. Hull was called by Mrs. Dagley's husband to take the acknowledgment, nor the further fact as to the second deed that Mrs. Curry was called by Mr. Dagley to witness grantor's signature, warrants an inference of undue influence. It is as reasonable that grantor requested Mr. Dagley to do so. Without further proof the courts will not draw a forced inference. And no inference at all may be drawn from those facts alone. The burden to prove undue influence is upon appellants (who charge it) and there is no burden upon respondents to disprove it. At least, not until undue influence is proved or is legally inferable. That Mr. and Mrs. Dagley were present when the first deed was executed; and that they and Luther McCoy were present when the second deed was executed gives rise to no inference of undue influence. Frank Hull, J. C. Shelton and Mrs. Curry, present when the deeds were executed, were cross-examined by appellants' counsel. But no word remotely indicating participation by grantees (nor undue influence) fell from their lips. Nor did appellants' counsel cross-examine them upon that subject. None of the record facts as to the execution of the deeds, singly or in any combination, establish either participation or raise the inference of undue influence by grantees. That they were present

is true. That Lester Eugene Dagley summoned Mr. Hull and Mrs. Curry is true. But mere opportunity and suspicion alone cannot take the place of substantial proof or legal inference of the active exercise at the time of the execution of the deeds of such force, coercion or over-persuasion as destroys the will of the grantor. White v. McGuffin, (Mo. Sup.) 246 S. W. 226, 231.

Does the fact that, under the instant circumstances, grantor chose respondents (and thereby excluded appellants) to have his property raise any inference of undue influence? When at the age of 77, the grantor's wife died, of his own accord he quickly fled to the refuge of a home open to him, that of his daughter, Velma Dagley. That daughter gave her father such attention and care as a kind and dutiful daughter should have given under the circumstances. With no reflection on appellants, none of his other children seem to have urged on grantor their willingness to accept the burden of the infinite care and the heavy responsibility of his declining years. During the three years thereafter, and before his death, the record indicates grantor not only was no longer the rugged farmer of the years then gone, but also that on occasions he was quite ill. For no one can life hold a more lonesome and desolate period. Grantor's son, Luther, seems to have willingly discharged the responsibility of managing his father's small amount of farm property. No one else seems to have been willing to do so. Luther, too, alone, sat the silent watches of the night at grantor's bedside in a Kansas City hospital through the fever, the coma and the pneumonia.

When grantor came into 1946, in his 80th year, he must have had some realization that his earthly end was approaching. It is small wonder that he then desired to and did transfer his pitifully small earthly possessions to those who, when his companion had died in 1943, had opened their arms and their hearts, and had offered their kindly ministrations and their home, to bring comfort and companionship into his last years. It is likewise small wonder that Luther who, attending to renting grantor's farm and collecting payment for a small corn crop, by his father's overt act should have received a portion of his father's bounty. Such disposition of his earthly possessions under such circumstances, such an expression of basic natural attachment and gratitude and affection, equity must rightfully decline to characterize as sufficient to raise an inference of undue influence. Lastofka v. Lastofka, supra, Walter v. Alt, supra. May equity never become so cold and unreasoning, may it never become so insensitive to the natural impulses and emotions of the human heart that under the situation instantly presented the mere exercise of a free choice of beneficiary will be tarred with the brush of an inference of invalidity. We hold that no inference of undue influence arises from these facts, or from any or all of them.

The findings and decrees of the trial chancellor are amply supported by the evidence in this case. Upon such evidence and in deference to the chancellor's action, his judgments and decrees must be and are affirmed. It is so ordered. All concur.