228 S.W.2d 731 (1950)
KEY et al.
v.
KILBURN.
Nos. 41600, 41601.
Supreme Court of Missouri, Division No. 1.
April 10, 1950.
*732 R. W. Hawkins, Caruthersville, attorney for appellants.
Ward & Reeves, Caruthersville, attorneys for respondent.
*733 DALTON, Judge.
These actions in equity, consolidated on appeal, involve title to described real estate in Pemiscot and Dunklin counties, respectively. In the Pemiscot county case, plaintiffs seek to set aside a conveyance on the ground of mental incapacity, fraud, duress, undue influence and want of consideration. The cause went on change of venue to Dunklin county and was there consolidated for the purpose of trial with the Dunklin county case, wherein plaintiffs seek to establish a resulting trust in and determine title to the described Dunklin county real estate, which they allege was received by defendant in exchange for certain real estate in Scott county that defendant received under a deed plaintiffs charge was void because of mental incapacity, fraud, duress, undue influence and want of consideration. The trial court found the issues in both cases for defendant and plaintiffs have appealed.
W. A. Key (the grantor in the deeds here in controversy and one of the original plaintiffs) was 80 years of age in March 1949, the causes were tried in May 1949, and Key died in August, after the appeals were taken. The causes have been revived in the names of his heirs at law. Key was twice married, but had been single 28 years. At the time of the trial, he had nine children living, two, Ophelia Kilburn and Willard Key, were by his last wife. Key separated from his second wife when Ophelia was a small child and she made her home with her father. In 1933, Ophelia married and moved to Steele but in a few weeks Key purchased a house and some lots in Denton, Pemiscot county, and asked Ophelia and her husband to make their home there with him, which they did. In May 1939, Key conveyed the Denton property (not involved here) to Ophelia, her three children and his son Willard Key. When this conveyance was made, there was an oral agreement that Key, Ophelia, her husband and her children were to live together and make the property their home and Ophelia was to take care of her father as long as he lived. Thereafter, on July 3, 1945, by separate deeds, Key conveyed 160 acres of land in Scott county and 80 acres in Pemiscot county to his daughter Ophelia Kilburn, defendant-respondent. A further deed to the Pemiscot county land was executed and delivered on December 21, 1945 to correct a defective acknowledgment. Each deed recited a consideration of five dollars, but no cash consideration passed between the parties. On December 19, 1945, respondent and her husband conveyed the Scott county real estate to one Tyler and wife and received in exchange, as part of the consideration for the conveyance, a deed to the described 80 acres in Dunklin county. Thereafter, Key, his daughter and her family continued to make their home together in Denton until Key left for San Jose, California, in December, 1948, to visit his daughter Mollie Key.
On February 17, 1949, while Key was visiting in California, Minnie Van Winkle (one of Key's daughters by his first wife) instituted each of these suits in her own name. On March 4, 1949, Key executed a written document authorizing his son Walter Key to bring suit, if necessary, to protect his rights in the properties in the two counties. Thereafter, Key was joined as a party plaintiff in both of these suits and amended petitions were filed on March 25, 1949. Key returned to Missouri in April 1949 and testified at the trial.
Key's testimony tended to show that he came to Pemiscot county in 1901 and was a farmer and a trader, raised livestock and traded until he went to California in December 1948. He owned and conveyed the 80 acres in Pemiscot county and the 160 acres in Scott county to his daughter Ophelia, but no payment was made therefor. He knew he was giving the property to her. He really didn't know just why he made the conveyances, but they (apparently Ophelia and her husband) wanted to put an $1800 loan on the Pemiscot county land and get possession and let him have the rent on the Dunklin county land. After Ophelia got the Pemiscot county land, she borrowed $1800 on it, but hadn't paid interest and taxes for two years. He knew Ophelia got the Dunklin county land on a trade for the Scott county land, because he handled the trade and obtained a difference of $1,000 *734 in money and property, which he retained. Ophelia didn't get any part of the $1,000 except $20, and her husband got $10. Before these conveyances were made, he had already conveyed the Denton property to Ophelia and her three children. He purchased the Denton property after Ophelia's marriage and asked her and her husband to come and live with him there and keep house for him. The Denton property was conveyed to her upon the agreement that he was to have his home there with her as long as he lived. When he deeded the Scott county land to Ophelia, she agreed that he was to have the rent on the property as long as he lived. This agreement was made when the deed was made. When he traded the Scott county land for the Dunklin county land, he was to have the rent from the Dunklin county land. He got the rent, $700 one year, $800 or $900 another year and $1,400 another year. He got it all, except $66 in 1948, which Ophelia collected and didn't send to him.
At the time of the trial Key had a skin cancer on his face and he had had one removed a few years before. He also had kidney trouble. These conditions existed when the 1945 deeds were made and they were getting worse. He couldn't read very well, but could write his name. He said Ophelia took care of him, but didn't furnish him a living. She cooked and washed part of the time, but he bought "lots of groceries" and was paying his way with rents from the Dunklin county land. He took the position that she had always lived with him. He left Denton in December 1948 and went to Blytheville, Arkansas, where he visited his daughter May and saw his daughter Minnie. He said they talked "about this lawsuit"; and that it was the first time he "ever got it preached to me like they did." He went from Blytheville, Arkansas, to California, accompanied by his son Willard, and took $1,700 with him.
He said he went to California voluntarily and because "they didn't treat me right * * * they would go off and leave me one time three months and another time five weeks and when they would go to pick cotton they would not leave me any dinner." When he was sick in bed his bed would not be made in three weeks unless he made it. While he was in California he sent for his special brand of tobacco, but Ophelia didn't send it. He claimed that Ophelia said she could sell the Dunklin county land and asked him if he would swap the rent on the Dunklin county land for the rent on the Pemiscot county land and let her sell the Dunklin county land and he agreed "if nothing else would do." He decided to join in Minnie's suit to set the deeds aside after he heard that they (apparently Ophelia and her husband) "were giving these lawyers thirty acres of ground that I paid for to win the suits." The other children told him Ophelia "was giving thirty acres of land to you lawyers" and was "trying to get everything in her own name." He knew of these suits before he got back from California, but he subsequently admitted that he didn't know Minnie Van Winkle had actually filed the suits until he got back. He got into the suits to prevent Ophelia's lawyers from "stealing that land, getting that 30 acres for nothing." He didn't want her lawyers to have the land. He had nothing against Ophelia, but did have against her husband. He knew what he was doing when he deeded the farms to Ophelia and he thought he then had a good mind. He had a lawyer prepare the deeds after he had talked of making the deeds for some time. Ophelia didn't have anything to do with having the property conveyed to her, but she did get the old deeds for him to take to the lawyer's office. He didn't know whether any one went with him to the lawyer's office or not. He delivered the deeds to Ophelia when he came home. She went and had them recorded and he went along. He gave the property to Ophelia because he "thought she would make something out of it, but she started to spend it." Ophelia was good to him "up until this thing come up and they got everything and she was not good to me any more and that is how come me to leave."
After he had deeded the Denton property to Ophelia, her children and his son Willard, he tried to get Willard to quitclaim the property to Ophelia. He said *735 that was the understanding and he even paid Willard $75, paid him several times, but Willard didn't make the deed. Key said Ophelia refused to let him have his bed and bedclothes when he went to California. He asked her to ship the bed to him, if he went out there, and she said it was her bed.
The deposition of Dr. F. B. Elliott, of Blytheville, Arkansas, tended to show that he had practiced medicine for some 50 years and had treated Key for ten days in 1940 for skin cancer and again in 1948. Key was worried about his condition, since he was suffering from both cancer and diabetes. He seemed "a little bit off" and "ought to have somebody looking after him." Witness didn't see Key from 1940 until 1948, but Key was in the same condition in 1948, his mental condition was not good, he "acted like he was off." The only reason assigned for thinking Key was mentally incompetent was that in 1940 Key came to witness and asked for treatment and claimed to be a pauper, but after witness treated him, he or his children paid the bill. In 1948, Key came for further treatment and witness refused to treat him without being paid. Key then said "he had a lot of land and had money." After he was treated in 1948, he came back and paid witness and bragged about what he had. At that time Key "wasn't able to look after himself, * * * he was feeble and old and absent minded, suffering from diabetes and cancer and his mind was not active."
Eula Posey testified that, from "the way he acted," she didn't think Key's mind had "really been good since his last wife left him * * * he didn't seem to be right." No facts were stated as a basis for the opinion given. Witness further said that after "this property" (not otherwise identified) was deeded to Ophelia, Ophelia said Key "deeded it to her because he wanted her to come and live with him and be there to take care of him and he could help her raise her children."
Other evidence tended to show that, after the property was conveyed, Key was not well taken care of; that he slept in a small cold room; that his bed was not made nor his room kept clean; that he suffered from pneumonia in February and March, 1946; that, on one occasion, Ophelia and her family went to Michigan and left him alone; that Ophelia fussed about the other children visiting their father; and that in December 1948, when Key went to California, he was undernourished, his clothes were dirty and unironed and he carried his possessions in a sack. Ophelia did not send her father any money while he was in California, nor the tobacco he requested. One witness said he had heard Ophelia curse her father and had heard her say she wanted to move away and get out. Another witness had heard her say to her mother, "Mother, I have got everything made over to me." Minnie Van Winkle said she instituted the suits at the direction of her father, because she understood from him that Ophelia was trying to sell the Dunklin county land and she didn't want the land sold. She thought Ophelia would kick her father out when she got his property.
Defendant's evidence tended to show that Key had told a number of witnesses that he was going to give his property to his daughter Ophelia; that she meant more to him than the other children; and that she had been good to him. He told others, after the conveyances were made, that he gave his property to Ophelia because he felt she should have it as he stayed with her and she took care of him and "treated him good." A number of witnesses testified that, in 1945, Key was still engaged in trading stock and that he took care of his business and appeared to be in good health and mind. There was considerable evidence tending to show that he was very fond of Ophelia's children (his grandchildren) and frequently bought things for them. Other evidence tended to show that Ophelia cooked his meals, made his bed, kept the house clean and looked after the home where Key lived. Before he left for California he told witnesses that he was going; that Ophelia didn't want him to go, but that he was going out to spend the winter with his daughter Mollie, as Missouri weather had been too hard on him. Ophelia said she did not at any time ask *736 him to leave, but she tried to keep him from going out to California and that he only planned to stay there until spring. Other evidence tended to show that Ophelia and her husband bought the groceries for the family, but that Key bought small items, such as crackers, cereals and tobacco, and that sometimes Key's hogs were killed for meat for the family.
In addition to matters about which there is no dispute, Ophelia testified that in 1945, her father asked her to look up the old deeds to his property but didn't say what he wanted with them. He took them to town and after awhile came back with new deeds for the property and gave them to her and said "here is a present for you and don't let anybody know about this, it is strictly a secret." He then told her he wanted her to take care of him; and that he wanted her to have the property. She told him she would stay with him as long as he wanted her to. She hadn't made any promises before that time and had not asked him to convey the property to her. He told her to have the deeds recorded and he went with her when they were recorded. She said that she went to Michigan for a few weeks in 1944, before the property was deeded to her; and that she returned home when she heard that her father was not well. When her father asked to have the rent from the 80 acres in Dunklin county, she told him "sure"; and that he did collect all of the rents on the Dunklin county land, but he had agreed to pay the taxes and upkeep on this property. He did not pay the taxes in 1948 and even refused to do so. After he went to California she collected $66 of the rent to pay the taxes, but that amount was insufficient and she spent it for something else. She said that she had lived with her father all her life and had taken care of him both before and after the conveyances were made. She denied that she had ever cursed and abused him or failed to take care of him. The $1,800 borrowed on the Pemiscot county land was to obtain money with which to farm the property. She said her father didn't buy a bill of groceries for the family once in six months. She had had no trouble with her father and he had had no trouble with her husband, but he had had trouble with his son. It will not be necessary to review other evidence.
Appellants assign error on the exclusion of evidence and on the findings for defendant-respondent. The evidence excluded was a deposition of W. A. Key, taken by defendant and offered by plaintiffs. It is contended that the deposition "was taken on agreement of both parties * * * that it could be used in the trial of both these cases." Appellants insist that, although Key was present in the court room and testified as a witness, he was in worse condition mentally and physically at the time of the trial (May 23, 1949) than he was on May 5, 1949 when his deposition was taken; and that the agreement anticipated that Key's "condition might deteriorate and therefore the agreement to use his deposition in the trial of all cases." Appellants concede that ordinarily a deposition can not be used when the witness is present.
The matter of any agreement between counsel for the use of the deposition was not presented to or ruled upon by the trial court. When the deposition was offered and objection was made counsel only said: "The reason I offer it is that they cross-examined him and tried to show that he testified to something different at Steele." In such situation error can not be based upon any agreement. No evidence was offered as to any change in Key's mental or physical condition between May 5 and May 23 and such does not appear from a comparison of the deposition with Key's testimony at the trial. His testimony was substantially the same on both occasions. The trial court did not err in excluding the deposition. Appellants were in nowise prejudiced by the exclusion. The assignment is overruled.
Appellants complain of the findings for respondent and contend the evidence shows: (1) that Key was incompetent to make the deeds; (2) that respondent sustained a confidential relationship with her father and the exercise of undue influence is presumed; (3) that no consideration was paid *737 for the conveyances and the actual consideration for the transfers failed; and (4) that, since Key "owned the purchase money," a trust resulted and respondent "held the property in trust for her father." In effect it is conceded that there was no evidence to sustain the charges of duress and fraud and neither issue is briefed on this appeal.
In an equity case we try the cause de novo, review the evidence and reach our own conclusions as to its weight and value, giving due deference to the trial chancellor who saw the witnesses and heard them testify. Schneider v. Johnson, Mo. Sup., 207 S.W.2d 461, 465.
The burden of proof rested upon appellants to establish by clear, cogent and convincing evidence the alleged mental incapacity of the grantor at the very time the deeds were executed. Schneider v. Johnson, supra; McCoy v. McCoy, Mo.Sup., 227 S.W.2d 698, not yet reported in the State Reports. In this case the overwhelming weight of the evidence on the issue of mental capacity tends to show that in 1945 Key was of sound mind and was actively engaged as a trader and able to manage and tend to his business affairs. The evidence shows that he was mentally competent to make the conveyances in question which were not a part of a business transaction, but were gifts to the grantor's daughter and the same standard of mental capacity was not required. Curtis v. Alexander, Mo.Sup., 257 S.W. 432, 437; McCoy v. McCoy, supra. The opinion testimony of lay witness Posey was valueless, since the witness stated no facts inconsistent with mental capacity. Lee v. Ullery, 346 Mo. 236, 244, 140 S.W.2d 5. The testimony of Dr. Elliott was of little value since he had not seen Key between 1940 and 1948 and could not testify as to his condition in 1945, when the deeds were executed. McCoy v. McCoy, supra.
On the issue of undue influence appellants contend that a confidential relationship existed because of grantor's fondness for respondent and her children and that "she used and exercised that relation and influence" until she secured his property. There are no facts and circumstances in evidence tending to show the exercise of "undue influence" as those words have been defined and used in the opinions of this court. The matter of undue influence has been so recently, full and adequately reviewed in the recent case of McCoy v. McCoy, supra, that little further need be added. Assuming without deciding that a confidential relationship existed between Ophelia and her father, no presumption of undue influence arose from that relationship alone. Loehr v. Starke, 332 Mo. 131, 56 S.W.2d 772; Ulrich v. Zimmerman, 349 Mo. 772, 163 S.W.2d 567. The burden of proof remained on the plaintiffs-appellants. McCoy v. McCoy, supra. The record fails to sustain the charge of undue influence.
The deeds were not void for want of consideration. The evidence shows the conveyances were intended as gifts of the described property. Each of the deeds recited a consideration of five dollars. This was a sufficient recital to make the deeds operative and effective as conveyances and prevent a resulting trust to the grantor. Bobb v. Bobb, 89 Mo. 411, 419, 4 S.W. 511; Chambers v. Chambers, 227 Mo. 262, 287, 127 S.W. 86, 137 Am. St.Rep. 567; Palmer v. Palmer, Mo.Sup., 238 S.W. 423, 424; Schneider v. Johnson, Mo.Sup., 207 S.W.2d 461, 467; Frey v. Onstott, Mo.Sup., 210 S.W.2d 87, 93. Nor was there any failure of consideration. While the evidence shows a definite oral agreement concerning the conveyance of the Denton property, the subsequent conveyances were not based upon any such oral agreement. After the deeds were executed and delivered, the evidence does show that Key told his daughter that he wanted her to take care of him and she informed him that she would stay with him as long as he wanted her to. Key also requested the rent on the Scott county land and later on the Dunklin county land and he admitted that he received it, except as to the $66. He was to pay the taxes, but the 1948 taxes were not paid. The deeds, however, contained no conditions subsequent so as to authorize a reversion to the grantor for breach of any agreement and *738 there were no provisions for forfeiture. In any case the deeds could not be set aside on account of the breach of an oral agreement. Anderson v. Gaines, 156 Mo. 664, 670, 57 S.W. 726.
No question of a resulting trust arises upon the facts shown by this record. In this case title to the property in Pemiscot and Scott counties was in Key and he transferred such title by the deeds. With Key's consent and assistance, respondent exchanged the Scott county land for land in Dunklin county and by consent of both parties Key subsequently collected the rent from the Dunklin county land. There was no failure of consideration and no resulting trust. Appellants cite Shaw v. Shaw, 86 Mo. 594; McMurray v. McMurray, 180 Mo. 526, 79 S.W. 701; and Phillips v. Overfield, 100 Mo. 466, 13 S.W. 705, which have no application under the facts of this case. We think the record shows completed gifts, inter vivos, perfected by delivery and acceptance of deeds transferring the grantor's title, and such gifts may not at the grantor's election be subsequently changed into a trust, the deeds canceled and the real estate or its proceeds recovered. Franklin v. Moss, Mo.Sup., 101 S.W.2d 711, 714; Hardaway v. Hardaway, 281 Mo. 403, 219 S.W. 360. Appellants have no right, title or interest in the described property.
The decrees are amply supported by substantial evidence. On such evidence and in deference to the chancellor's findings, the judgments should be affirmed.
It is so ordered.
All concur.