Dora A. HUDSPETH, Respondent,

v.

Grover C. ZORN and Fontelle L. Zorn,
Appellants.

No. 44937.

Supreme Court of Missouri.

Division No. 1.

July 9, 1956.

Errol Joyce, Edwin Yagel, Robert Devoy, Brookfield, for appellants.

George T. Sweitzer, Anderson & Anderson, Harrisonville, H. K. West, Brookfield, for respondent.

HYDE, Judge.

Action to set aside a deed to land in Chariton County, made to defendants by plaintiff and her husband (deceased before the trial) who held title by the entirety. The Court's decree set the deed aside and defendants have appealed.

This suit was brought on July 16, 1952, by Dora A. Hudspeth (herein referred to as plaintiff) and W. C. Hudspeth as guardian of plaintiff's husband, Clifton Hudspeth, a person of unsound mind. The suit was in two counts, the first count was to set aside the deed; the second count was for one-fourth of the crops raised in 1952 and thereafter for rent of the land. The deed was executed May 29, 1952, recorded July 3, 1952; and the guardian appointed on July 7, 1952, the date Clifton Hudspeth was determined to be of unsound mind. Clifton Hudspeth died October 10, 1954, and this suit was tried in January 1955. Both plaintiff and her husband were about 79 years old at the time the deed was executed.

Plaintiff and her husband, by the deed sought to be set aside, conveyed to defendants 230 acres of land for $1,000. The Court in a memorandum filed with its decree found that, on May 29, 1952, Clifton Hudspeth "was not mentally competent of understanding and acting with discretion in the ordinary affairs of life and was mentally incompetent of executing the deed." The Court also found that he had not seen the land for about ten years; that plaintiff had not seen the land for many years and had no knowledge of land values; and that they both relied on defendants' representations as to the value and condition of the land which the Court considered to be untrue, finding that the consideration paid was grossly inadequate. The decree set aside the deed, ordered the consideration (which had been paid into Court) paid to defendants; and found (as to the second count) that defendants had made improvements equal to the rental value so that nothing more was due plaintiff for rent. Defendants' specific contentions are that the evidence was "insufficient to sustain the finding of the Court that Clifton Hudspeth was without mental capacity to convey"; that there was no evidence of undue influence; and that the evidence was "insufficient to sustain the finding of the Court that the consideration was grossly inadequate."

■■ It is true as defendants state (citing Meyer v. Schaub, 364 Mo. 711, 266 S.W.2d 620; Edinger v. Kratzer, Mo.Sup., 175 S.W.2d 807) that in this kind of a case, we have the duty to review the case anew on its merits, to weigh the evidence and reach our own conclusion as to its weight and value. It is also true as they say (citing McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698 and Stubblefield v. Husband, 341 Mo. 38, 106 S.W.2d 419) the cancellation of a deed is the exercise of the most extraordinary power of a court of equity and requires clear, cogent and convincing evidence. However, we think there was such evidence in this case and that it was sufficient to support the result reached by the decree.

It was shown that the Hudspeths paid $22,000 for the land in 1920, of which $20,000 came to Clifton Hudspeth from his father's estate at that time. Defendant Grover Zorn had farmed the land since 1925. He owned other land in Chariton County and rented this land on a share basis. The Hudspeths never lived on the

Chariton County farm but owned and lived on a 194 acre farm in Cass County near Harrisonville, about 130 miles from the Chariton County farm. The evidence was that Hudspeth had not seen the Chariton County farm since 1941 and that plaintiff had only been on it once many years before that. The land was in the Grand River bottoms, the river running along one side of it and curving around it; and it had been overflowed many times between 1941 and 1952, the worst floods being in 1951, when the river was at flood stage six times. Old buildings on the land had deteriorated, so as to be no longer usable, and through this period Hudspeth received little more than enough to pay the taxes. It appears that Hudspeth had complete confidence in Zorn and accepted what he gave him as his part of crop proceeds without question and without any check. Zorn said he visited the Hudspeths' home two or three times during that period; and he also wrote to him about the farm. Zorn was married in 1949 and he and his wife went to see the Hudspeths in 1951. (There is a conflict in the evidence as to whether this was before or after the 1951 flood.) They came again on Sunday, May 25, 1952. Plaintiff's evidence was that many representations were then made by both defendants as to the value and condition of the farm and that Zorn had previously made similar representations by letter. These representations were that the farm wasn't worth anything; that there couldn't be anything raised on it; that the place was washed all to pieces, washed out with big gulleys all over the farm with water standing in them; that they couldn't farm over these ditches; that sand was washed all over the farm; and that willows had grown up over it so big and heavy it couldn't be tended and they could be got out only with a bulldozer. Mrs. Zorn said to plaintiff that to fix it up "would cost an awful lot of money and she didn't think it would pay us to try"; that "she couldn't see why we wouldn't try to sell it." Defendants denied making any representations to plaintiff or

her husband about the farm or its value or suggestions that they sell it. Zorn's version of what occurred was that he did not go there to buy the farm but to explain the situation. He said Mr. Hudspeth proposed the sale and made the offer to sell in the presence of plaintiff. Zorn said he told the Hudspeths that he could not stay over to complete the purchase but would come back later in the week and told them to think it over three or four days, saying: "If you decide to sell it, we'll take it." Defendants came back on Thursday, May 29th and went with the Hudspeths to an abstracter's office in Harrisonville (selected by Hudspeth) where the deed was prepared from the abstract, executed and delivered. A check for $1,000, also prepared by the abstracter, was signed by Zorn and delivered to Hudspeth, who took it to his bank in Harrisonville, accompanied by Zorn, and used it to take up his notes held by the bank.

It was shown that in April 1952, Zorn had made application for work on the farm under the government land rehabilitation program. Inspection of the land was made on April 3, 1952 and the application was approved for rehabilitating a total of 25 acres, not all in one piece. This work was filling washes, ditches and hollows, shoving out the willows and cottonwoods and sand deposits; and it was done early in June 1952, starting the second day after defendants got the deed; 23 acres were leveled with about five days work. The cost was about $800 of which the government paid $360 and Zorn paid about $440. (The bulldozer operator testified at least that much more work was needed.) Plaintiff told their grandson W. C. Hudspeth about the deed about two weeks after it was made. He had heard defendants making representations concerning the condition of the farm, and trying to buy it, on their 1951 visit and he decided to go look at the farm. He went with two other farmers who lived near him about the middle of June. After seeing it, he employed a lawyer and proceedings were commenced which resulted

in Clifton Hudspeth being found to be of unsound mind and W. C. Hudspeth was appointed his guardian. (Hereinafter, he will be referred to as guardian.) Thereafter, in July, the guardian went to the farm again, with the same men and his lawyer, and offered Zorn the consideration of $1,000 for a reconveyance of the farm, which was refused. The description of the farm by the guardian and the two farmers with him, was that there was 200 acres tillable land and not more than 30 acres waste land. They said the sand deposits were near the river where it curved around part of the farm and could be farmed over. They estimated there were 90 acres in corn (three plantings, some big, some laid by and some still being cultivated), 40 acres of beans (two plantings, some 3 inches high and some 8 to 10 inches), 40 acres of wheat (not too good quality that would make about 15 bushels per acre) and 20 to 30 acres of plowed ground not planted. They found no washes or ditches but saw evidence of bulldozing work. Defendants' evidence was that the land had not been cultivated in 1951 because of floods; that in the spring of 1952 there was only about 30 acres not covered by willows; that 35 to 40 acres of young willows were plowed in, in June 1952, and about 25 acres rehabilitated but not planted; and that in July 1952 there was 40 to 50 acres of corn, 20 acres of wheat and 8 acres of beans. Zorn estimated that less than 100 acres was tillable. He said there had been 25 floods during the last six years.

Plaintiff's evidence as to the value was that the land was worth $40 to $50 per acre. Defendants had two witnesses who qualified to testify as to value. One of these said the value after the 1951 flood, before it was cleaned up in 1952, was $5.00 to $7.50 per acre. The other, the township assessor, said (under those conditions at that time) the value was $12.50 per acre. (Defendants paid less than $4.35.) It was shown that an adjoining tract of 500 acres sold for $6.00 per acre that year. (One witness said all the timber had been taken off of

that tract and that it was left in brush.) The assessor said all Grand River bottom land had been assessed at no less than $10.00 per acre and that the practice was to assess land at about fifty per cent of the full cash market value. The Hudspeth 230 acre farm was assessed at $2,300 in 1951, 1952, 1953 and 1954. Other facts will be stated in connection with the rulings hereinafter made.

■ We think there was substantial evidence to prove that Clifton Hudspeth was incompetent to make the deed. Three lay witnesses who had known him for many years stated that in their opinion he was insane. Defendants say their opinions were improperly based on evidence of sickness, old age, eccentricities of dress and habit, inability to recognize friends, feebleness resulting from illness or mental confusion and other facts or circumstances not inconsistent with the ability to understand the ordinary affairs of life, citing Cutler v. Zollinger, 117 Mo. 92, 22 S.W. 895; Lee v. Ullery, 346 Mo. 236, 140 S.W.2d 5; In re Nelson's Estate, Mo.App., 185 S.W.2d 890; Weakley v. Weakley, 355 Mo. 882, 198 S.W.2d 699; McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698; Wright v. Stevens, Mo.Sup., 246 S.W.2d 817. However, there was much more than that as a basis for these opinions. These witnesses and others did say that Mr. Hudspeth tied strings around the bottoms of his pants legs and wore an overcoat and overshoes into the summer. They also said that he lost his interest in farming; that he constantly gathered rocks and bricks and took them home, broke them up and put them on his drive; that he continuously gathered sticks and large weeds and cut them up and kept them for kindling (one of them said he had enough kindling for 25 years); that he gathered and stacked old tires (having several hundred); and that he only did these things in the last few years. However, one of them who had lived near him and worked for him said Mr. Hudspeth would come to his house, ask him his name and when he told him said he had never

heard of him before and asked if he had lived there long. He also said that Mr. Hudspeth would come over and say he forgot what he came for and that sometimes he took him home. Another said he helped Mr. Hudspeth put up hay and left his hayrake there with his permission. When he went back to get it, it was gone and Mr. Hudspeth said he did not know anything about it but he later found the old man had sold it for junk. Several times Mr. Hudspeth would ask him his name and say "I dont know you"; then he would say he remembered him. The third witness said that in the spring of 1952 he rented 40 acres of Mr. Hudspeth's home farm to put in corn, as Mr. Hudspeth had requested him to do a dozen times during the winter. He planted corn in April and went back in May to cultivate it. Mr. Hudspeth didn't remember anything about renting it to him and told him to get off and stay off, saying it was his corn and that if he caught him there again he would shoot him. In addition to these witnesses, a doctor who examined Mr. Hudspeth before the sanity hearing said he found Parkinsonism, a degeneration of the brain; and "a senile deterioration that actually bordered on a psychosis." He had never treated Mr. Hudspeth before he made that examination but said that on the basis of certain facts stated in the testimony at the sanity hearing he would certainly judge him insane. There was other evidence on this subject, and also to show that Mr. Hudspeth no longer understood the value of property or money. We, therefore, hold the evidence was sufficient to support the finding of the Court on this issue. See Machens v. Machens, Mo.Sup., 263 S.W.2d 724 and cases cited. Furthermore, as stated in McCoy v. McCoy, supra, 227 S.W.2d loc. cit. 704: "The law differentiates between the mental capacity required of grantor making a deed as a part of the arms-length business transaction and the mental capacity required when grantor is receiving but the satisfaction of heart and mind

which comes from benefiting those near and dear to him."

■ However, the principal basis of plaintiff's petition was that defendants wilfully and deliberately made false and untrue representations to the Hudspeths about the condition and value of the farm to induce them to rely thereon and upon which they did rely and act in making the deed for a consideration of $1,000. While there is conflict in the evidence about these representations being made and the truth of them, these matters depend upon the oral testimony of witnesses who appeared before the trial judge and we should defer to his findings, since they seem proper upon consideration of all of the evidence in this case. (See Section 510.310 RSMo and cases cited under 510.310 V.A.M.S. notes 107, 108, and 143, 144.) The issue of undue influence which defendants raise is not really a material issue under the pleadings and evidence in this case, although a showing of a relationship of trust and confidence is material on the issue of fraud and reliance upon misrepresentations. (See 9 Am.Jur. 368, Sec. 21.) In this case, it appears that Zorn had full control of the farm, decided how it was to be farmed, rented part of it to others, and determined the Hudspeths' share of the crops, which he sold, sending them the proceeds. Thus there was complete reliance upon him in these matters and a confidential fiduciary relationship existed. However, the issue actually involved herein is the right of rescission of a transaction induced by false representations. "Where a party is induced to enter into a transaction with another party, that he was under no duty to enter into, by means of the latter's fraud or material misrepresentation, the transaction is voidable as against the latter." Restatement of Contracts, Sec. 476 and cases cited in Missouri Annotations; Messina v. Greubel, 358 Mo. 439, 215 S.W.2d 456; Ellenburg v. Edward K. Love Realty Co., 332 Mo. 766, 59 S.W.2d 625. The power to avoid a transaction for fraud or mis-

representation, of course, is conditional on an offer made promptly after acquiring knowledge of the fraud or misrepresentation to return the amount of money received. (Restatement of Contracts, Sec. 480 and cases cited in Missouri Annotations.) In this case the guardian did promptly make such an offer, which was renewed in the petition and paid into court; and the decree orders this money paid to defendants. See also 23 Am.Jur. 931, Sec. 134; 24 Am.Jur. 12, Secs. 195–196; 17 C.J.S., Contracts, §§ 418, 439, pp. 902, 921. Furthermore, as held in the Ellenburg case, supra, 59 S.W.2d loc. cit. 627, a false representation of a material fact is ground for rescission, even though innocently and honestly made.

■ By finding the consideration for the deed to be grossly inadequate and entering the decree of cancellation, the Court necessarily believed plaintiff's evidence as to the condition and value of the farm and as to the representations made by defendants about these matters, and also believed these representations were untrue. The fact that such representations were made is strongly corroborated by some of the letters in evidence, from Zorn to Hudspeth; and gross inadequacy of the consideration is shown, as the Court found, by the testimony of one of defendants' own witnesses, the township assessor. See Wright v. Brown, Mo.Sup., 242 S.W.2d 486. The Court evidently believed the testimony of the guardian and the farmers, who went with him to see the farm in June and July 1952, as to the condition and productivity of the farm. Even defendants' evidence, as to the crops on it at that time, indicates that the condition of the farm was not as bad as stated in the representations shown by plaintiff's evidence to have been made by defendants. It also seems significant that Zorn had all the arrangements made under the government reclamation program, before he went to see the Hudspeths, so that the work could be started the second day after he got the deed. While it is true that the farm had been damaged by floods and was not worth more than half as much (under any of the evidence) as the Hudspeths had paid for it, nevertheless upon the whole record the consideration, as the Court found, appears grossly inadequate. (As to the effect of gross inadequacy see Frey v. Onstott, 357 Mo. 721, 210 S.W.2d 87, 9 Am.Jur. 370, Secs. 24–26.) We, therefore, hold that there was sufficient evidence to support the trial court's findings; and further hold that, deferring to his findings on the credibility of the witnesses who testified orally before him, we should accept these findings which seem to us to be correct and proper upon consideration of the whole record.

The judgment is affirmed.

All concur.