John A. CRUWELL, Emma Cruwell, Louise Cruwell Carson, and William Cruwell, Respondents,

v.

Nellie M. VAUGHN and John Vaughn, Appellants.

No. 48621.

Supreme Court of Missouri,

Division No. 1.

Jan. 8, 1962.

Motion for Rehearing or to Transfer to Court en Banc Denied Feb. 12, 1962.

Paul Barnett, Kansas City, for appellants.

Homer A. Cope and Donald W. Browne, and Walter A. Raymond, Kansas City, for respondents. Raymond, West & Cochrane, Kansas City, of counsel.

HOLMAN, Commissioner.

Andrew J. Cruwell died intestate on September 6, 1957. His heirs were his five children. Four of his children are plaintiffs herein and the other child, Nellie, is a defendant. Nellie's husband, John Vaughn, was also made a defendant. On December 26, 1956, Andrew executed a deed which conveyed to Nellie his one-half interest in an 82-acre farm located in Jackson County. An error was subsequently discovered in the description of the land in said deed and on April 10, 1957, Andrew executed another deed to Nellie which conveyed the land by a correct description. In this suit plaintiffs sought to set aside those deeds upon the ground that the grantor was mentally incompetent to transfer said property on said dates, and also that the deeds were procured as a result of undue influence exercised by defendants. The trial court found for plaintiffs upon both issues and entered a judgment and decree setting aside said deeds. Defendants have appealed. We have jurisdiction because title to land is involved and also because of the amount in

dispute (it was stipulated that said land was of the value of $1,000 per acre). The nature of our review requires a rather complete statement of the evidence.

Andrew and his wife were divorced in 1947. At that time a property settlement was entered into whereby Andrew received a 17-acre tract of land located on Phelps Road in eastern Jackson County. For a few months he lived in a one-room building (with a dirt floor) located on that tract.

The defendants were married in March 1947. Nellie was interested in her father and apparently desired to work out a plan to improve his living conditions. After some discussions Andrew and defendants entered into a so-called partnership. It was not a true partnership agreement because Andrew was to participate in the profits, if any, but was not to pay any losses. The arrangement was that defendants would build Andrew a concrete block house on the 17-acre tract and obtain city water and electricity for the premises. They also agreed to make certain advancements for Andrew's living expenses and to help in furnishing the house. There was to be a five-year partnership on the farming operations with defendants furnishing the money to purchase chickens, turkeys, and certain livestock. As a part of the agreement Andrew, on June 25, 1947, deeded the 17-acre tract to Nellie reserving, however, a life estate therein.

The defendants built the house and made other advancements during the five-year period, all of which totaled more than $2,200. There were no profits from the farming enterprise and none of the money advanced was repaid to defendants. During the five years following the expiration of the partnership period Nellie gave her father money and equipment of the total value of about $1,800. In addition, she gave him groceries, clothing, and many small items of household appliances.

During most of the time in question defendants lived in Houston, Texas, but would visit in Missouri at least twice a year. They would always come at Christmas and usually in July. Three of the plaintiffs, John Cruwell, Emma Cruwell, and Louise Carson, lived in Jackson County. William Cruwell lived on a farm near Odessa, about 40 miles from Andrew's home.

The 82-acre tract of land involved in this case was owned by Andrew's brother, Ben Cruwell, who died intestate December 18, 1956. Ben's heirs were a nephew, Ernest A. Cruwell, Jr. and Andrew, each of whom inherited an undivided one-half interest in Ben's farm. At the time of Ben's death there was a $7,000 mortgage on the land. Andrew was deeply grieved by Ben's death and a number of witnesses said that he seemed to lose interest in life after that event. All of the parties agreed that Andrew had drunk intoxicants rather heavily for many years and that he probably drank more following Ben's death. During the period in question Andrew lived alone on the 17-acre farm. He received an old age assistance check of about $50 per month and supplemented that income by working occasionally for a few days at a time. He worked as a laborer and also did some painting and carpenter work.

In addition to some of the facts heretofore stated plaintiffs presented the following evidence: John A. Cruwell testified that he was a son of Andrew and that he saw his father almost every day the last two or three years before his death because he would stop by and do the chores for him; that his father was 71 years old at the time of his death; that after Ben's death Andrew drank more heavily, didn't eat sufficiently, was weak, and "didn't do hardly anything"; that he would start talking about one subject and would change off on another; that his father said he wanted to die; that he was in the Independence Sanitarium for five days following November 19, 1956, and had to be strapped in bed, and on the first day didn't recognize anyone; that the doctor said at that time that he had had a stroke; that his father's memory was bad as evidenced by an incident in Decem-

ber 1956 when he had taken his father to the doctor and waited to take him home, but his father forgot that he was waiting and went home with someone else; that toward the last his father would talk like he thought he had plenty of money; that on the morning of December 26, 1956 (the day the first deed was made) he stopped by his father's home to see if the hogs had been fed and watered and found defendants there; that his father looked weak, didn't walk very well, and "I could tell he had been drinking"; that his father had a fifth of whiskey with. him with about a third of it gone; that John Vaughn said they were taking him to the doctor; that thereafter, on occasions, his father had told him that he was going to tie up Ben's farm so that Ernest would not get it; that on September 6, 1957, his father was found dead at the front door of his home.

Upon cross-examination this witness stated that his mother had the family dinner each Christmas and that his father was not invited; that during one summer he had entertained with a barbecue dinner while his sister Nellie was visiting from Texas and his father was not present because "I didn't have enough to invite the whole neighborhood."

Another plaintiff, Emma Cruwell, worked in the office at the Rock Quarry located not far from her father's home. She testified that during the last two years of her father's life she would see him two or three times a week as she drove down the road, or on occasions when he would come to the office; that it was the family understanding that when her father conveyed the 17 acres to Nellie she was to take care of him until he died; that her father's health got steadily worse after he was in the hospital in November 1956; that his conversations would ramble, and after Ben's death he lost interest in life; that every time she saw her father after he left the hospital in November 1956 he had been drinking and as a result of that drinking "I would say definitely he was not able to carry on any business."

On cross-examination this witness stated that on the evening of December 26, 1956, John Vaughn told her that Andrew had deeded his part of Ben's estate to Nellie, and on the afternoon of December 27, four of the children were in the office at the Rock Quarry, at which time "Uncle Ben's property was discussed." She also stated that at no time had she given her father any money or supplies.

Plaintiff William Cruwell testified that after his father had been in the hospital in November 1956 he "slipped pretty fast" and, when drinking, wouldn't talk coherently; that in the spring of 1957 he said he had signed some papers so Ernest wouldn't get anything. In further describing his father's condition at that time he stated that "all of a sudden he would want to go somewhere, if you would take him there he didn't want to go there at all. He would want to see somebody, when you got there he wouldn't even get out of the car. He would talk about he was going to buy a big farm, he had a lot of money, things that didn't make sense." This witness stated that during the last year of his father's life he saw him from one to four times a week because he farmed some of the 17-acre tract and also farmed the Ben Cruwell land during the 1957 crop season. He also testified that during the Christmas holidays in 1956 his father drank pretty heavily, and he didn't think he was mentally able to comprehend any type of business transaction at that time; that he saw his father on April 10, 1957 (the date the second deed was executed) at about 9 a. m. and he was intoxicated and could not talk coherently; that his father always talked like he still owned Ben's farm and "I don't think the man even knew he had deeded the place to anybody."

Thomas L. Casey testified that he had known Andrew for 50 years and that during the last three years of his life Andrew was a heavy drinker; that after his stroke in November 1956 Andrew "seemed like a different kind of man." The witness gave

as his reasons for making that statement that Andrew used to "stand kidding," but after his stroke he would get mad and walk away when someone would kid him, and that on one occasion Andrew wanted to sell him a bunch of hogs but he didn't buy them because he thought Andrew was pricing them too cheap.

Another neighbor, David Burch, testified that he had known Andrew all his life and saw him about three times a week during 1956 and 1957; that on most of those occasions Andrew had had too much to drink; that after Ben died he appeared depressed and would walk around with his head down; that on one occasion about three months before he died he saw Andrew lose his temper when "some guy was kidding him a little bit."

Clarence Roman testified that he had been a neighbor of Andrew for 20 years and saw him two or three times a month during 1956 and 1957; that they had a drink together in December 1956; that when Andrew was not drinking he didn't notice anything unusual about him but when he was drinking he couldn't keep a straight thought; that about that time he didn't act like himself, "I would say the man was sick."

Plaintiffs also offered as a witness D. P. Johnson, another neighbor of Andrew's. He stated that after Andrew was in the hospital in November he wouldn't stay on a subject; that they had talked about making a will and Andrew had said that he wanted his children to share alike; that he made that statement the first time in 1956 and again just five or six days before he died.

In the ten years before his death Andrew was in the hospital a number of times. The hospital records were offered in evidence. On January 31, 1947, Andrew was admitted to Independence Sanitarium, the records showing the following diagnosis and comment: "1. Myocarditis, acute, probably due to coronary occlusion. 2. Arterio-

sclerosis, generalized. 3. Hypertension. 4. Chronic nephritis. 5. Dementia, senile, arteriosclerotic. This patient is totally incoherent and irresponsible, absolutely uncooperative, and has to be restrained." On February 4, he was discharged from that hospital and admitted to the psychiatric department of Kansas City General Hospital where his brother, Ernest C. Cruwell, gave the following history: "Mr. A. J. Cruwell was placed in the Independence Sanitarium by Dr. H. V. Woods of Independence. He persisted in getting out of bed and roaming the halls endangering the recovery of other patients. He was supposed to have a bad heart and was being treated accordingly. He has visions of dogs, grasshoppers and cats. Thinks everything is on fire." He was discharged from the municipal hospital on February 14, 1947.

On November 19, 1956, Andrew was found by his brother at his home in an unconscious condition and was taken by ambulance to Independence Sanitarium. The record indicates that upon admission to the hospital he was in a convulsive seizure and totally unconscious. He was dismissed from the hospital on November 24, 1956. No further record evidence will be given concerning this hospitalization as Dr. Hink testified in regard to the same.

Three times in 1957 Andrew was admitted to the County Hospital for short periods of treatment. The first instance was on February 8 when he was taken to the hospital following a seizure which resulted in numbness of the throat and chest. His condition was diagnosed as arteriosclerosis. He was discharged on February 10. He was again admitted to that hospital on February 26 when brought there by a neighbor. The record indicates that he had been drinking and complained of weak spells and blood in his urine. The diagnosis was epilepsy and arteriosclerosis. He was discharged on March 1. His last admission to that hospital was on July 28. His condition was then diagnosed as (1) heat ex-

haustion, and (2) epilepsy. He was discharged on August 3.

Dr. Fred Hink testified that he had been in the general practice of medicine since 1932; that he saw Andrew when he entered the hospital November 19, 1956, and cared for him until his discharge November 24; that he had never seen him before that time and did not see him again after his discharge; that upon admission to the hospital the patient was unconscious and in a convulsive seizure; that he was suffering from hardening of the arteries and high blood pressure which had caused brain damage; also cardiac insufficiency, acute myocarditis, and "senility, dementia, arteriosclerosis"; that Mr. Cruwell was irrational and had to be restrained with a strait jacket. This witness expressed the opinion that Andrew was of unsound mind when in the hospital in November 1956, and that his condition would remain stationary or probably get worse. For that reason he was also of the opinion that Andrew was of unsound mind on December 26, 1956, and on April 10, 1957.

Upon cross-examination he stated, upon examination of the 1947 hospital records, that in his opinion Andrew could not have been of sound mind at that time, since the records indicated that he was suffering from senile dementia due to sclerosis.

Plaintiff also read in evidence admissions from the deposition of Nellie Vaughn to the effect that she was of the opinion that her father had d. t.'s from drinking at the time he was in the hospital in November 1956, and that her father drank quite heavily in December because he was grieved over the death of his brother. An admission was also read from the deposition of John Vaughn who stated that they had taken Andrew to the hospital three times with d. t.'s and that while in the hospital Andrew wouldn't have been in condition to handle his affairs.

We will next state the evidence offered by defendants. Nellie Vaughn testified concerning the agreement she made with her father in 1947, and the manner in which she had carried out the agreement and the results of the so-called partnership, all of which have been heretofore related. This witness testified further that when she came to Missouri for Christmas in 1956 she saw her father on the afternoon of the 24th, and he had requested that she make an appointment to see Mr. Nourse and that she had made the appointment for the 26th; that she saw her father on the morning of the 25th and that she and her husband came to get her father on the 26th in order to keep the appointment with Mr. Nourse; that as they traveled along in the car her father said, "Nellie, I want to give you and John my half interest in the 82 acres"; that when they arrived at Mr. Nourse's office her father went into the private office with him and she and her husband stayed in the waiting room and in the hall; that when they came out sometime later "Dad was joking and laughing with Mr. Nourse and said, 'Well, you know this calls for a dollar,' and Mr. Nourse took out a silver dollar and gave it to him. My dad then handed me the deed and said, 'Let's go to Independence and get it filed.' " She further stated that they stopped at a restaurant for lunch and then went to Independence and filed the deed in the recorder's office; that during lunch "Dad said he wanted me to have the land and that he had other children but he didn't wish for them to share in this land" because "I had helped him when he needed help, they had not helped him, they had not been to see him"; that on the evening of that day "I told my sister Emma that my father had deeded his interest in the 82 acres to me and that if she and my other sister and brothers would cooperate and help me make the payments on the mortgage and taxes, I would share with them"; that she had told Emma, Louise, and John substantially the same thing the next day at the Rock Quarry, at which time John had said that he thought the 17 acres was "all I should have."

This witness also stated that she had seen her father intoxicated, but that on the occasions when she had come to Missouri she had always notified him when she planned to visit him and he was never intoxicated at those times; that he had visited her in Texas for two weeks during Christmas of 1950, and had not drunk during that period; that her father was not drinking on the occasions when she saw him in 1956, and that she had never seen her father do anything queer or unnatural in any way. This witness also testified concerning her receipts and disbursements in connection with the Ben Cruwell farm since the half interest had been deeded to her, but there appears to be no controversy concerning that accounting matter.

John Vaughn testified that as they were en route to the lawyer's office on the morning of the 26th Mr. Cruwell told them he was going to give them Ben's property and that "I told him he had other children, he said, 'I don't want to leave it to my other children, they haven't done anything for me and you and Nell have.' I said, 'Don't leave it to me. If you want to leave it to Nell, give it to Nell, but don't give it to me.'" The remainder of this witness' testimony concerning the making and recording of the deed is very similar to that of his wife and need not be repeated. Mr. Vaughn also stated that he and his wife were back in Missouri on April 4, 1957, at which time they arranged for leasing the farm to William Cruwell, and were in Missouri on a visit again in July 1957. This witness further stated that he had never seen Andrew Cruwell do or say anything at any time that was queer or abnormal, and it was his opinion that in December 1956 Mr. Cruwell was sane.

The attorney who prepared both of the deeds in question, James B. Nourse, testified that he had known Andrew for 15 years and had seen him often during that time; that he drew the deed dated June 25, 1947, by which Andrew conveyed the 17 acres to Mrs. Vaughn; that on the morning of December 26, 1956, when Andrew came into his private office he first sought his advice concerning the Benjamin Cruwell property and asked concerning his interest in the same; that after questioning Andrew concerning Ben's relatives, the witness advised him that he had an undivided one-half interest in the farm; that Andrew then stated that he wanted to deed his interest therein to Mrs. Vaughn; that he then questioned Andrew about all of his children and what they were doing. "He seemed to have full knowledge of his children that they were doing all right." He further testified that Andrew stated that Nellie had been especially kind and considerate of him, had shown him attention and affection, and that he wanted to make this an absolute deed rather than reserving a life estate; that Mr. Cruwell explained his reason for making an absolute deed, stating that the property involved financing since there was a mortgage on it, as well as unpaid taxes; that Andrew had brought in the tax bill and another paper that gave the legal description, and the deed was then prepared and Mr. Cruwell signed and acknowledged it before the witness who was also a notary public. He then testified concerning the delivery of the deed in about the same manner as related by Mrs. Vaughn.

Mr. Nourse also testified that Andrew consulted him about the personal property in Ben's estate and told him that he had taken the hogs to his place temporarily so that they would be cared for; that he then prepared an application for appointment as administrator of Ben's estate and it was signed by Andrew and filed in the probate court; that a hearing was held on January 17, 1957, at which Andrew was in attendance and testified at length concerning the property in Ben's estate; that on that occasion Andrew's son John, and Ernest, the other heir, appeared and sought appointment as administrator of Ben's estate; that after a hearing the court appointed Andrew Cruwell and Ernest Cruwell, Jr. as joint administrators. The witness stated further that he acted as attorney for the administrators but that Andrew did much of the work in

conducting the administration of the estate; that about March 15 an abstracter, who had been one of the appraisers of Ben's estate, called his attention to a clerical error in the description of the land in the deed of December 26; that he had advised Andrew Cruwell of this situation and Mr. Cruwell had instructed him to draw a deed correcting the description; that after Mr. Cruwell had properly executed and acknowledged the deed, he (Nourse) mailed it to Nellie at her home in Texas. Mr. Nourse further testified that he saw Andrew many times between December 26, 1956 and May 12, 1957, and that he was never intoxicated and he saw no evidence that he had been drinking; that he had never seen Andrew take a drink of whiskey or beer and had never smelled any odor of alcohol on his breath in the 15 years he had known him; that on December 26, 1956, Andrew was in good condition "mentally, physically and generally, for a man of his age."

Louise Carson is a plaintiff in this action but testified on behalf of the defendants. Much of her testimony is a repetition of facts heretofore stated. She stated that she had visited with her father during the latter part of 1956, and during that period had seen him from time to time; that he had never said anything that she thought was peculiar or unusual, and for years back he had had a habit of quickly changing the subject of conversation; that he had always recognized her and her child when they would see him. As a matter of impeachment this witness conceded upon cross-examination that she had signed a contract employing attorneys for the plaintiffs which recited that Andrew was mentally imcompetent on December 26, 1956, but she explained that she had not read the contract before signing it.

Defendants also called Ernest A. Cruwell, Jr., a nephew of Andrew's and the other heir to Ben's estate. He stated that Andrew, Ben, and his father had all lived within three miles of each other; that in 1955 he had moved to town and after that

saw Andrew about once a week; that Andrew always recognized him and often mentioned his (Andrew's) children and knew who they were; that he and Andrew had been joint administrators of Ben's estate; that Andrew had sold the hogs belonging to the estate; that he could do any type of farm work; that he never had any trouble following Andrew's conversations and had never seen him drunk when he was doing any business.

Ted Cowden, a neighbor of Andrew's, testified that Andrew had worked some for him; that he had told him that Nellie had helped him quite a bit; that he talked about all of his children and knew who they were; that towards the last he seemed to get mixed up on the names of some of the neighbors.

Kit Carson testified that he married Louise in May 1956; that he had had an opportunity to visit with Andrew only on a few occasions but had not seen him do anything peculiar or unusual; that in March 1957 they had met Andrew on the road and showed him their month-old son who was named for Mr. Cruwell and that when they met him two months later he recognized that child and talked about him.

Another neighbor, Raymond Beckman, stated that he had known Andrew for 13 years and Andrew had worked for him "off and on" for 7 years; that several times during 1956 and 1957 Andrew was a guest at his house for dinner; that he had never seen Andrew do anything unusual or irrational and was of the opinion that his mind was sound in 1956 and 1957; that Andrew had worked for him the last time in January 1957.

E. G. Casey stated that he lived about a mile from Andrew and had known him for 40 years; that they visited together once or twice a month; that he had never seen anything unusual or queer in Andrew's conduct and was of the opinion that he had a sound mind. Upon cross-examination it was brought out that this witness and Andrew often drank together, sometimes for several days in succession.

Another neighbor, Neil Casey, stated that he had known Andrew all his life and had seen him several times a month. He expressed the opinion that Andrew was of sound mind.

At the outset of our consideration of the merits of this appeal we consider it appropriate to state certain established rules applicable to cases of this nature. We have repeatedly said that " 'The cancellation of a deed is the exercise "of the most extraordinary power of a court of equity, which ought not to be exercised except in a clear case," Lastofka et al. v. Lastofka, 339 Mo. 770, 99 S.W.2d 46, loc. cit. 54, and the evidence to justify cancellation should be clear, cogent, and convincing.' " Edinger v. Kratzer, Mo.Sup., 175 S.W.2d 807, 813. The burden is upon plaintiffs to present evidence which, when tested by the quoted rules, is sufficient to warrant the cancellation of the deeds. "And, where as here, it is sought to set aside a voluntary deed because grantor lacked the mental capacity to execute a valid instrument of conveyance to his property, the burden is upon those who seek to have it set aside to establish that *at the time of its execution* grantor lacked such mental capacity. * * * The law differentiates between the mental capacity required of grantor making a deed as a part of the arms-length business transaction and the mental capacity required when grantor is receiving but the satisfaction of heart and mind which comes from benefitting those near and dear to him. In the latter instance if he has sufficient mental capacity to know the extent of his property, his relatives and their respective claims on his bounty, the demands of the law have been satisfied." And that "mere proof of illnesses, or imperfect memory, or forgetfulness of names and persons, or old age with its attendant physical and intellectual weaknesses, or mental confusion, or arteriosclerosis, either singly or in combination, unless it further appears that grantor did not understand the nature of the instant transactions, and did not with such under-standing voluntarily enter into and consummate the transactions, are insufficient to invalidate these deeds." McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698, 703, 704.

In this equity case, while we give due deference to the findings of the trial chancellor, we cannot escape the duty and responsibility placed upon us to arrive at our own conclusions as to the weight and value of the evidence and determine the facts accordingly. After a careful review of all of the evidence we have concluded that the weight of the evidence is strongly against the finding of the trial chancellor upon both issues, i. e., mental incompetency and undue influence.

We will first consider the evidence relating to grantor's mental incapacity. It must, of course, be recognized that plaintiffs offered evidence tending to prove that Andrew was of unsound mind at the time of the execution of the deeds and that defendants offered evidence indicating a contrary condition. Much of the evidence on each side came from interested witnesses. Other evidence, such as the opinion testimony of the neighbor-witnesses is not particularly convincing. Unquestionably, the strongest evidence offered by plaintiffs was the hospital records and the opinion testimony of Dr. Hink.

The facts disclosed by the hospital records have been detailed heretofore and need not be restated. Dr. Hink observed Andrew from November 19 to 24, 1956 while in the Independence Hospital. He expressed the opinion that he was of unsound mind at the time. Based upon that observation, the various hospital records, and particularly upon the diagnosis of "senile dementia due to arteriosclerosis," Dr. Hink was of the opinion that Andrew was of unsound mind on December 26, 1956, and April 10, 1957. He had not seen Andrew since November 24, 1956. His opinion that Andrew was of unsound mind on the dates the deeds were executed was based upon the fact that his previous illness had been diagnosed as senile dementia due

to arteriosclerosis, and he was of the opinion that said condition never gets better but remains stationary or gets worse. The records of Andrew's 1947 hospitalization show a similar diagnosis. Based upon that record Dr. Hink was of the opinion that Andrew was of unsound mind at that time. It is therefore fair to conclude that (assuming the correctness of the 1947 diagnosis) it was Dr. Hink's opinion that Andrew was of unsound mind from January 31, 1947 until the date of his death.

While it may be that Andrew was mentally incompetent during the period he was acutely ill in the hospital in November 1956, we do not find Dr. Hink's testimony convincing as to Andrew's mental condition at other times. This because those conclusions conflict with much of the convincing evidence hereinafter discussed and are contrary to the undisputed facts to the effect that Andrew was usually able to care for himself, often worked for various employers, and led a more or less normal life

There are a number of facts and circumstances which tend to support a finding that Andrew was capable of making and did make valid conveyances to Nellie. In the first place there was a reasonable basis for Andrew to prefer Nellie over his other children. She had been loyal and good to him for ten years and during most of that time his other children did not pay much attention to him. Nellie and Andrew had a strong affection for each other. It is also significant that Nellie immediately told the other children about the conveyance. That conduct did not indicate that she had any feeling of having taken advantage of a person who was mentally incompetent. We note, also, that there is no contention but that Andrew (except when acutely ill in the hospital) always knew his children, talked of them, and had them in mind.

We are also impressed by the fact that the probate court appointed Andrew co-administrator of Ben's estate on January 17, 1957. There were three applicants for that appointment and the court held a hearing to determine who should be appointed. Andrew testified at length about the property in the estate. If Andrew had been of unsound mind we believe the probate judge would have discovered that condition and would not have appointed him. It is also significant that he fully performed his duties as administrator.

As heretofore indicated we give considerable weight to the fact that Andrew was able to live alone, prepare his meals, work for various employers from time to time, care for his chickens and hogs, and, in general, lead a substantially normal life. That type of conduct is not consistent with the view that he was of unsound mind.

We are also of the opinion that the testimony of three of defendants' witnesses is especially significant and entitled to considerable weight. They are James B. Nourse, Louise Carson, and Ernest A. Cruwell, Jr. We will briefly discuss their testimony.

It was the burden of plaintiffs to establish Andrew's incompetency *at the time* of the execution of the deeds. The person in the most favorable position to tell of his condition at that time was Mr. Nourse. He talked with Andrew for a period of two or three hours on December 26 just prior to the execution of the deed. He questioned Andrew in detail about Ben's property and relatives and also concerning his (Andrew's) children. If Andrew had been of unsound mind at that time it is inconceivable that an experienced attorney such as Mr. Nourse would not have discovered that condition under those circumstances. Mr. Nourse was also with him on a number of occasions during the administration of Ben's estate and was with him at the time of the execution of the second deed on April 10, 1957. The substance of his testimony is that Andrew voluntarily made the conveyances with full knowledge of what he was doing, with his other children in mind, and was not under the influence of alcohol at the time either deed was executed. If his testimony is to be believed the

plaintiffs cannot prevail. While it is true that he had known Andrew and defendants for a number of years and represented defendants for a time in this case (he withdrew as counsel when it appeared that the suit would be tried and that he would, of course, be a witness) we are unable to find any sufficient reason for refusing to give credit to his testimony.

Ernest A. Cruwell, Jr. was a relative who knew Andrew well but had no interest in this case. He worked with Andrew in connection with the administration of Ben's estate. Ernest said Andrew talked with him about his children and had said that Nellie had taken care of him. He also stated that Andrew could do any kind of work; that he never saw him drunk when he was transacting any business, and that he never had any difficulty following Andrew's conversations.

Louise Carson was a plaintiff but testified for defendants. This was clearly against her financial interest. She stated that her father always recognized her and her child; that she never heard him say anything which she considered peculiar or unusual.

■ While we recognize that each case must be determined according to its own facts, we have compared the facts in this case with certain other cases in which deeds were held to be valid and are of the view that the evidence here is less favorable to plaintiffs than it was to the plaintiffs in those cases. Said cases are Edinger v. Kratzer, supra, McCoy v. McCoy, supra, Walton v. Van Camp, Mo.Sup., 283 S.W.2d 493, and Hedrick v. Hedrick, 350 Mo. 716, 168 S.W.2d 69.

As heretofore indicated we find that plaintiffs have failed to carry the burden of proving by convincing evidence that Andrew was mentally incompetent at the time he executed the deeds in question. The evidence preponderates in favor of defendants. We accordingly rule that defendants are entitled to prevail upon that issue.

We also think it is clear that the finding upon the issue of undue influence should be for the defendants. The defendants were in Texas until two days before the first deed was executed. Their only connection with the transaction was that Nellie, at Andrew's request, made the appointment with Mr. Nourse and she and her husband took him to the attorney's office and, although not present were nearby at the time the deed was executed. According to the testimony defendants did not know of Andrew's intention to make the deed until they were on the way to Mr. Nourse's office. Defendants were in Texas and had no connection with the execution of the second deed. It is therefore apparent that there is no direct evidence of undue influence and we do not think the evidence heretofore stated is sufficient from which a court could infer such influence. "The mere opportunity to influence, * * * unsupported by evidence showing its actual existence, is not sufficient to invalidate a deed." Walton v. Van Camp, Mo.Sup., 283 S.W.2d 493, 502.

Plaintiffs say they proved that a confidential relationship existed between Andrew and Nellie. We do not agree. There is no evidence that Nellie ever transacted any business for her father. She merely gave him money and items of personal property for his use and comfort. The so-called partnership had expired almost five years before the deeds were made. Plaintiffs also point out that D. P. Johnson testified that Andrew, in 1956, had told him he wanted his children to share alike and that since the deed made a contrary disposition, that evidence would warrant an inference of undue influence. While we think the statement Andrew made to Mr. Johnson is properly to be considered upon this issue, we certainly do not consider it decisive. For the reasons stated we rule that the evidence was not sufficient to warrant a finding that the deeds in question were procured by the exercise of undue influence upon the grantor.

The judgment is reversed.

COIL and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.