Mary Elizabeth SCHNURBUSCH, by her Next Friend, William H. Frye, Respondent-Appellant,

v.

Sylvester A. BOHNERT and Albertine Bohnert, Appellants-Respondents,

Federal Land Bank of St. Louis and Walter R. Brown, Trustee, Respondents.

No. 50736.

Supreme Court of Missouri,

En Banc.

Nov. 8, 1965.

Raymond H. Vogel, Vogel & Frye, Cape Girardeau, for respondent-appellant.

Leo J. Rozier, Perryville, Edw. D. Summers, Frankfort, Ky., for appellants-respondents, Sylvester A. and Albertine Bohnert.

WELBORN, Commissioner.

This is an action by Mary Elizabeth Schnurbusch through a next friend against Sylvester A. Bohnert and Albertine Bohnert, husband and wife, to set aside a deed. The Federal Land Bank of St. Louis, holder of a note secured by a deed of trust on the property, was a party defendant as was Walter R. Brown, trustee under such deed of trust. The relief sought was based upon allegations that the plaintiff grantor was of unsound mind on the date of execution of the deed and that a fiduciary and confidential relationship existed between the plaintiff and the Bohnerts and that the Bohnerts induced the plaintiff to execute the deed through undue influence. The trial court found that plaintiff had sufficient mind to know and understand the transaction which resulted in the execution of the deed. It further found that a fiduciary and confidential relationship did exist between plaintiff and the Bohnerts and the deed was the result of undue influence exerted over the plaintiff by the Bohnerts. The trial court ordered the deed set aside. The Bohnerts appealed from this decree.

The court also entered an interlocutory judgment in favor of plaintiff against the Bohnerts for the amount of $13,057.67, the amount owed the Federal Land Bank which was secured by a deed of trust on the land

in question and other land of defendants. The interlocutory portion of the judgment was to be discharged upon release of the land in question from the lien of the deed of trust.

Plaintiff sought to amend the decree by making certain changes in the portion thereof which was interlocutory and making the money judgment final. The trial court overruled the motion to amend and plaintiff appealed from the order overruling her motion to amend the judgment and decree. Defendants have moved to dismiss plaintiff's appeal on the grounds that the order appealed from is not final.

The land which is the subject of this controversy is a 158½-acre farm in Perry County, Missouri. It was described as "the home place" of the plaintiff, an unmarried woman 71 years of age at the time of the trial in June, 1963. Plaintiff had not lived on the farm for a number of years, having left there shortly after her father's death in 1942. She inherited from her father a share in the farm and in 1943 purchased the outstanding ⅚ interest of the other heirs for $3,979.16. She rented the farm from time to time while she was in other cities doing missionary work for Jehovah's Witnesses. According to the plaintiff, the only rent she ever received was $280 from one tenant. The evidence showed that at the date of the deed the farm was in a run-down condition.

On January 6, 1954, plaintiff, who was then living in St. Charles, Missouri, went to the Washington University Psychiatric Clinic. She was seen there by physicians who found her in a state of agitated depression. The clinic record shows that at that time plaintiff entertained the idea of returning to the farm to live. Her last visit to the clinic was on January 20, 1954. On February 16, 1954, she went to Oak Ridge, Missouri, in Cape Girardeau County, where she lived at a rest home or nursing home.

Plaintiff's sister, Anna Bohnert, lived about one mile north of Perryville and

Anna's son, Sylvester, lived on a 70-acre farm about ten miles south of Perryville. In March or April, 1954, Sylvester was in the vicinity of Oak Ridge at a sale. He visited the plaintiff at the nursing home. Plaintiff started talking about the farm, complaining that she was just paying taxes on it and not receiving any income from it. According to Sylvester, "she talked like she would sell it to me." A week or so later, Sylvester returned to visit the plaintiff and, according to him, plaintiff wanted to sell the farm to him, but he did not wish to buy it. Eventually, he agreed to rent it. Asked the terms of the rental arrangement, Sylvester stated: "She wasn't particular. She wanted to get me started, thought I might get interested enough to buy it."

Sometime in the summer of 1954, plaintiff came to live with her sister, Anna Bohnert. In July, 1954, plaintiff again became severely depressed and sought treatment at the outpatient department of State Hospital No. 4 at Farmington. Defendant and his wife drove the plaintiff to the hospital in their automobile. Electric shock therapy was undertaken and plaintiff received three such treatments from July 12 to July 19. A series of six treatments was planned, but the plaintiff did not return after the third. Plaintiff apparently continued to live with her sister in Perryville while receiving treatment at the outpatient department. The indication is that Sylvester accompanied by the plaintiff's sister drove the plaintiff back and forth on the other visits to the hospital during this series of treatments.

Sylvester planted corn on the farm, but the land was so poor that the crop "wasn't worth picking." Sylvester told the plaintiff that, in view of the poor crop, he could not afford to continue renting the farm. According to Sylvester, they then had several discussions regarding the sale of the farm and eventually an arrangement was reached under which the farm would be transferred to Sylvester in return for his providing a place to live and food for the plaintiff.

Sylvester and his wife took the plaintiff to the office of Curt Vogel, an attorney in Perryville. Plaintiff did not know Vogel. He was selected as the attorney in the transaction by Sylvester who paid the attorney's fee. According to Vogel, plaintiff and Sylvester, who was accompanied by his wife, told him of the arrangements which had been reached between them for the transfer of the farm to the Bohnerts. Sylvester said, "Curt and Mary done the talking, we listened." Vogel testified that the plaintiff "was familiar with what the situation was to be. They had discussed it among themselves and she seemed to be in complete accord with what was discussed there and she made some suggestions as to things she wanted, and the reason she wanted to sell because she was out of money."

On September 2, 1954, plaintiff returned to the outpatient department of the State Hospital in Farmington. The hospital records noted that she "was not eating or sleeping well and complains of being depressed." Apparently Sylvester brought her to Farmington on this occasion. On Tuesday, September 7, she returned to the hospital where she received a series of four electric shock treatments, the last on Wednesday, September 15. The hospital note on this date states: "Patient slowly getting over depression with EST. Is staying in nursing home downtown until finished treatments. Being away from family may also have helped. To return Friday."

On Friday, September 17, plaintiff did not appear for treatment. The hospital records show that she "packed up and left nursing home stating she was going home."

How the plaintiff returned to Perryville is not clear. In any event, on the following day, September 18, 1954, plaintiff and Sylvester went to Vogel's office. There plaintiff executed a deed conveying the farm to the Bohnerts. The parties also executed an agreement, apparently prepared in advance, under which the Bohnerts were to execute a 5-year note for $2,000, payable to plain-

tiff, without interest, to be secured by deed of trust on the property conveyed. The Bohnerts agreed that plaintiff could live in a small house which they had constructed near their residence on the 70-acre farm and that they would furnish the plaintiff necessary food and fuel. Plaintiff was to pay $30 per month for the use of the house, food and fuel, the amount to be credited monthly against the $2,000 note. The Bohnerts agreed to pay plaintiff's funeral expenses, expenses of her last illness and other claims against the estate of the plaintiff up to an amount equal to the balance on the $2,000 note at the time of her death. Upon payment in full of the $2,000, plaintiff would have the privilege of remaining in the house and receiving food and fuel for $30 per month.

The note and deed of trust were executed, the deed of trust by Sylvester and his wife and the note by Sylvester alone. The deed from plaintiff to the Bohnerts bore revenue stamps in the amount of $3.30. That portion of the apparent purchase price of some $2,500 to $3,000, which the revenue stamps indicated, in excess of the $2,000 represented by the note, was explained as compensation to Sylvester for previous services which he had performed for the benefit of the plaintiff. The deed was filed for record on September 20, 1954. The deed of trust was not recorded.

Plaintiff moved to the little house on the Bohnerts' farm. She described it as a "chicken house. It had chickens in it." The note was endorsed by Sylvester for $30 payments for each month from October 18, 1954 to February 18, 1955.

On March 31, 1955, Anna Bohnert filed an "INFORMATION OF INSANITY" in the Perry County Probate Court charging plaintiff was "insane." A hearing was held on the information on April 1, 1955 and an adjudication made that plaintiff was "a person of unsound mind and * * * a fit subject for State Hospital Number Four * * *." Plaintiff was still living in the small house on the farm at that time. On

April 18, 1955, she was admitted to State Hospital No. 4 where she remained until June, 1955, when she was "paroled" to her sister Anna. At the time of the trial, plaintiff was living alone in Perryville.

The petition in this action was filed October 5, 1960.

On the question of the value of the farm, the Perry County Assessor testified for plaintiff that the farm was assessed at $2,050 as of January 1, 1954, based upon approximately 20% of its cash value. The County Board of Equalization reduced the assessed valuation to $1,800 in July, 1954. In 1955, an order of the State Tax Commission resulted in an increase of the assessed valuation to $3,450, supposedly approximately 30% of cash value. In cross-examination the assessor acknowledged he had not visited the farm and was not acquainted with its condition. The trial court found his testimony "not particularly persuasive." We concur in such finding. Defendants' witnesses valued the land in 1954 at between $10 and $15 per acre.

On August 22, 1955, Sylvester applied to the Federal Land Bank for a loan to be secured by a deed of trust on his two farms. At that time he gave the 158½-acre farm a value of $5,000, explaining that he had spent $400 in liming and clearing the property. Testimony indicated that, at the time of the trial, the farm was valued between $12,000 and $16,000. The trial court found its value at the time of the deed to have been $6,000.00.

On the issue of plaintiff's mental capacity at the time of execution of the deed, plaintiff's principal witness was Dr. E. F. Hoctor who was superintendent of the Farmington State Hospital in 1954 and 1955. He had not seen the plaintiff as an outpatient in 1954, but had seen her when she was admitted in 1955. Doctor Hoctor's testimony was equivocal in response to a question as to the competency of the plaintiff in September, 1954. He stated: "It would be difficult to say with absolute cer-

tainty. I could only say that she apparently had an anxiety state, a profound depression, and just what her absolute capabilities were on that date, I could not say with certainty." He stated he didn't think it would be advisable for a person in the condition of plaintiff to enter into a business transaction on September 18, 1954. The doctor stated that impairment of memory is a result of electric shock therapy, but that, in his opinion, the plaintiff would not, on the date of the deed, by reason of the electric shock treatments which she had just received, have had a loss of memory about those things that had been discussed prior to the treatments. Doctor Hoctor testified that the plaintiff was neurotic but not psychotic.

Subsequent to closing the hearing the court permitted the plaintiff to reopen her case to present additional testimony on the question of her mental capacity. At the hearing at that time, in response to a question by the court, Doctor Hoctor stated that, on the 18th day of September, 1954, plaintiff had the capacity to understand in a reasonable manner the consequence of executing the deed. The deposition of Dr. Walter L. Moore, a psychiatrist in St. Louis, was also introduced. In it he expressed the opinion that a person who had undergone treatments such as the plaintiff had was not competent to execute any business or understand what she was doing.

We will not reiterate here the often-expressed principles which govern the determination of a case of this nature. See Houghton v. West, Mo.Sup., 305 S.W.2d 407, 411–412(1–6); Shaw v. Butler, Mo. Sup., 78 S.W.2d 420, 428(3, 4); Cruwell v. Vaughn, Mo.Sup., 353 S.W.2d 616, 624(1–8). We are mindful of such principles and of our function on the review of a case such as this.

Here we have as the grantor of a deed a 63-year-old single woman suffering from mental illness. She had been under psychiatric care in January, 1954. When she went to Oak Ridge in February, 1954, she was

depressed. "She didn't remember very good. She was confused about things and people." According to her sister, who described herself as "the only one" close to plaintiff, the plaintiff "just didn't have, you might say, a friend on earth." Even her sister displayed rather obvious hostility toward the plaintiff. "I had to do things for her. * * * If she doesn't get her way she pouts, everything is forcing. That is still not nice. She wants to make out like I am a criminal. She sends me away from her. She snaps me, she sasses me." There is little cause for wonder that when Sylvester called upon plaintiff at Oak Ridge, "she was happy to see me." The subject of the farm came up and, according to Sylvester, "she talked like she would sell it to me. I had a boy coming on and I could use it. I needed more land." (Whether these are Sylvester's thoughts or suggestions advanced to him by the plaintiff is not shown.) At any rate, Sylvester's interest was sufficiently aroused that he returned to visit Aunt Mary within a week or two and the subject of the farm was again discussed. Mary stayed at Oak Ridge for two or three months from February 15, 1954. According to Sylvester, he must have rented the farm in May because that is when corn should be planted. Sylvester stated that, after his second visit to Oak Ridge, "she was coming to me or calling me. She was really on the ball all the time."

Although the appellants state that the suggestion to lease the farm came from plaintiff, it appears that the idea originated with Sylvester. His testimony was that he told plaintiff he wasn't going to buy the farm. "I was going to rent if you will rent it to me." Plaintiff agreed to this arrangement. When asked what the rental terms were, Sylvester replied, "She wasn't particular." He then added, "She wanted to get me started, thought I might get interested enough to buy it." (Again, whether the latter is Mary's statement or merely Sylvester's conclusion is not stated.) At any rate plaintiff imposed sufficient

confidence in Sylvester to rent the farm to him on an indefinite arrangement. She further accepted his telling her that he was unable to produce any crop of value from the farm. She received no rental from him and apparently made no complaint on that score.

By Sylvester's account, the eventual arrangement for the purchase of the farm was arrived at only after he found that the corn crop which he planted in 1955 had failed. He told plaintiff he could not continue renting the farm and thereafter the sale arrangements were worked out. We note that in his deposition Sylvester testified that the arrangements were worked out in June, May or June. Then at the trial he testified they were worked out in June or July. In view of his testimony regarding the effect of the poor corn crop upon the transaction, the latter date would appear to be more nearly reasonable.

Sylvester related that plaintiff first stated that the only way she would sell the farm would be "if she could go with the place." He stated that was not acceptable to him and that they finally worked out among themselves what the arrangements should be. Sylvester then selected an attorney who would handle the transaction. Plaintiff relied upon Sylvester for that purpose. She did not know the attorney who was selected. Vogel thought that he "was representing all of the parties when they came in." On Sylvester's deposition, portions of which were read in evidence by plaintiff as admissions against interest, he stated that he and his wife took plaintiff to Vogel's office and "had Mr. Vogel explain it to her." Just what necessity there was for Vogel to explain to plaintiff the transaction which, according to the Bohnerts, had previously been agreed to between the plaintiff and themselves is not clear. We further note that, although Sylvester testified that he did not go to Vogel's office except in the company of Mary, Vogel testified that he "saw two or three of them together at least twice, probably Mr. Bohnert a few more times." This cer-

tainly would indicate that Bohnert did visit Vogel without Mary's being present.

The first visit to Vogel by Mary and the Bohnerts took place prior to the outpatient treatment which Mary received at the State Hospital in July. On her deposition Mrs. Bohnert testified that she made two trips to Vogel's office and that her trips to Farmington were in between the trips to Vogel's office. Inasmuch as Mrs. Bohnert was not present on September 18, which was shortly after Mary returned from Farmington after the second series of treatments, Mrs. Bohnert must have been referring to the July trips to Farmington. In any event, according to both Mrs. Bohnert and her husband, when the three of them visited Vogel's office the second time, Vogel had prepared the documents necessary to effectuate the transaction, but Vogel "still didn't think we ought to sign over because she wasn't fully decided on it." Again we note that this seems to be inconsistent with Sylvester's position that Mary was unduly anxious to sell the farm to him, kept pushing him to buy it, and his position that all of the arrangements had been agreed to prior to any visit to Vogel's office.

Sometime following the second visit to Vogel's office Mary returned to Farmington. She underwent a second series of electric shock treatments. Two days after the last treatment and on the day when she was to receive another, she left Farmington and returned to Perryville. The following day she and Bohnert went to Vogel's office and the documents were executed. The consideration for the deed, as evidenced by the documentary stamps, amounted to between $2,500 and $3,000.00. According to Mary "one time it was $3,000 and came down to $2,000.00." Bohnert explained the additional consideration as for "the favors I had done her or something." "I took her here and there. I never charged her anything, she wouldn't give me nothing." However, he did not discuss with Mary payment for such services. Vogel "assumed" that the additional consideration

was for service Bohnert had done for Mary and "he considered that part of the consideration." Vogel did not know whether he said anything to Mary about the part of the consideration represented by prior services on the part of Bohnert.

A case such as this must be decided upon its particular facts. Our decisions have not attempted to delimit the situations which will give rise to a confidential or fiduciary relationship in such cases. There must exist "a special trust and reliance which involves some fiduciary obligation on the part of the person so trusted, although it need not be a strictly technical fiduciary relationship." Flynn v. Union National Bank, Mo.App., 378 S.W.2d 1, 10–11(14). Here we think that the evidence did show the existence of special trust and reliance by Mary upon Sylvester. She was willing to entrust the rental of the farm to him without any particular arrangements. She left to his judgment the selection of an attorney in the transaction. Although her reliance upon Sylvester otherwise was not in business matters, the particular situation involving her mental state, of which Sylvester obviously had knowledge, although he endeavored to minimize his information, places the latter's activities under special scrutiny. 26 C.J.S. Deeds § 62b, pp. 768–769. Wilhoit v. Fite, Mo.Sup., 341 S.W.2d 806, 813(1–3). Knowing what he did of his aunt's mental condition and of her reliance upon him, he was under an obligation to deal with her in a manner other than he would have been free to do had this been a genuine arm's length transaction as it purported to be.

Sylvester's conduct subsequent to the transaction certainly casts doubt upon his good faith. His deed was recorded promptly. Mary's deed of trust was never recorded. Within a short time, after having spent $400 for improvements on the property, he gave it a value of $5,000. In connection with the application for the Federal Land Bank loan, he stated that there were no outstanding liens on the land. He knew full well at that time that Mary held a deed

of trust on the property. He merely listed his indebtedness to her as an open debt. He must have had some reason to be confident that her deed of trust was not going to be placed on record. Two years later, although Mary lived in the house provided for only a few months and no further payments were made on the $2,000 indebtedness to her, Sylvester in applying for a loan completely ignored the obligation to Mary.

Even in the absence of a fiduciary relationship, the evidence here might well afford a sufficient basis for setting aside the deed on the grounds of undue influence. Although Vogel testified that plaintiff clearly understood the transaction and was agreeable to it, the fact is that the transaction was not what plaintiff had, according to Sylvester, originally suggested ("The only way she would sell the farm was that she would go with it"). She was reluctant to accept the arrangement finally worked out. She was not fully informed regarding the consideration. Finally, her mental state was not normal. All of these circumstances tend clearly to show that the deed was in fact procured by Bohnert as a result of his influence upon plaintiff which rose to the mark of such overpersuasion as to amount to a substitution of Bohnert's will for that of plaintiff. Peine v. Sater, Mo.Sup., 289 S.W.2d 101, 109(4-6).

However, we consider that the trial court's finding of a fiduciary relationship was justified and that the evidence clearly raised an inference of undue influence which defendant failed to rebut. Therefore we will affirm the court's decree setting aside the deed. We do not consider the failure of plaintiff's petition specifically to offer generally to do equity a sufficient ground to require otherwise. The petition states that plaintiff is willing to do equity, although the specifc offer is merely to deliver to defendants the note and deed of trust executed by Bohnert. However, the petition asks for "such other relief as is meet and just in the premises."

This is a sufficient indication of plaintiff's willingness to make what restitution the court may think the case demands. Githens v. Butler County, 350 Mo. 295, 165 S.W.2d 650, 653(9, 10).

As for plaintiff's appeal, the trial court, pursuant to Civil Rule 82.06, V.A.M.R., designated as final for purposes of appeal that portion of its judgment and decree setting aside the deed. It entered further judgment, specifically designated as interlocutory in character, against the Bohnerts for the amount of the outstanding indebtedness to the Federal Land Bank, such judgment to stand discharged upon the release of the land here in controversy from the lien of the bank's deed of trust. The money judgment was also ordered held in abeyance until the issues remaining in the case were disposed of.

In her petition plaintiff asked for an accounting. After the trial and before final judgment, plaintiff filed a motion to dismiss that portion of her claim in which she sought an accounting. The trial court overruled the motion and defendants filed an amended answer in which they alleged that they had made permanent and extensive improvements on the land which would increase the value thereof so that the value was many times that at the time of the deed.

Plaintiff filed an after-trial motion to amend the decree by adding to that portion of the decree designated by the court as final a paragraph which would have ordered money judgment against the Bohnerts for $13,057.67, the judgment to stand discharged if within 60 days the land was released from the lien of the deed of trust. The essential ground for the motion was that there remained no issue to be disposed of in the case, plaintiff having moved to dismiss her claim for an accounting.

Obviously plaintiff is attempting to appeal from that portion of the decree which the trial court designated as interlocutory. The trial court was authorized to designate a portion of its decree final and to retain control of a portion thereof. As to the

latter, there is no final appealable judgment and defendants' motion to dismiss plaintiff's appeal will be sustained.

The judgment is affirmed on the appeal of Sylvester and Albertine Bohnert.

Mary Schnurbusch's appeal is dismissed.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

HYDE, HENLEY and EAGER, JJ., concur.

HOLMAN, J., concurs in result in opinion filed.

FINCH and DONNELLY, JJ., concur in result and concur in separate concurring opinion of HOLMAN, J.

STORCKMAN, C. J., dissents and adopts as dissenting opinion the Memorandum of Dissent filed by HOUSER, C.

HOUSER, Commissioner (dissenting).

I respectfully dissent from the proposed opinion for the reason that I do not think there is clear, cogent and convincing evidence justifying cancellation on the ground of mental incapacity, fiduciary and confidential relationship, or undue influence amounting to a substitution of Sylvester Bohnert's will for that of plaintiff.

The opinion, which upholds the cancellation of this deed on the basis of a fiduciary relationship and undue influence, depends upon the following to show confidential relationship: that plaintiff rented the farm to Sylvester under an indefinite arrangement; acquiesced in his statement at the end of the crop year that he was unable to produce a crop of value; did not complain of not receiving any rent; relied upon Sylvester to select an attorney to handle the transaction, and that Sylvester drove plaintiff to Farmington several times for outpatient visits to the mental hospital there. The opinion concedes that plaintiff did not otherwise rely upon Sylvester in business matters. I do not think this is sufficient to establish a fiduciary or confidential relationship between the parties.

The opinion depends upon the following to show undue influence: the fact that her mental state was not normal and that she was undergoing treatments at a mental hospital in close proximity to the date of the execution of the deed; that the transaction finally agreed upon was not what plaintiff had originally suggested; that plaintiff was reluctant to accept the arrangement finally worked out, and that she was not fully informed regarding the consideration. I do not think that this is sufficient to establish undue influence or that the court can infer undue influence therefrom. The most that can be said is that it shows an opportunity to exert undue influence, but this is not sufficent to invalidate a deed—its actual existence must have been shown. Cruwell v. Vaughan, Mo.Sup., 353 S.W.2d 616.

From the recital of facts in the opinion I would reverse the judgment on the Bohnerts' appeal.

HOLMAN, Judge (concurring in result).

I do not agree that the evidence on the issue of undue influence was sufficient to warrant setting aside the deed but I am of the opinion that the deed should have been set aside because of the mental incapacity of plaintiff. I therefore concur in the result of the principal opinion which affirmed the judgment.