**Woodrow F. FERGUSON, (Plaintiff) Respondent,**

v.

**Enoch S. KINDLE and Flossie E. Kindle, Boyd Shinn and Frances V. Shinn, (Defendants) Appellants.**

**No. 50851.**

Supreme Court of Missouri, Division No. 1.

Dec. 13, 1965.

James A. Rahm, L. Stanley Braton, Hensley, Rahm & Braton, Warrensburg, for respondent.

Lamm, Barnett, Crawford & Barnes, Sedalia, Max O. Bagby, Kansas City, for appellants.

HOLMAN, Judge.

In this action plaintiff sought a decree of specific performance of a contract dated June 9, 1960, for the sale of a 247-acre farm lying partially in Benton County and partially in St. Clair County. He also prayed that a deed dated September 30, 1960, whereby defendants Enoch and Flossie Kindle conveyed the farm to defendants Boyd and Frances Shinn, be set aside. A trial resulted in a decree in favor of plaintiff. All of the defendants have duly appealed. We have appellate jurisdiction since title to real estate is directly involved. For convenience we will hereinafter use the word "defendant" in referring to Enoch Kindle.

Defendant and his wife lived at Edwards, Missouri, in Benton County. They owned the farm in question and desired to sell it. In the spring of 1958 defendant talked with plaintiff about the sale of the farm and plaintiff told him that if he would wait until he sold his cattle in the fall he would buy the farm for $6,000. When plaintiff sold his cattle he told defendant he did not get enough money to buy the farm. Again in 1959 plaintiff told defendant he would buy the farm after he sold a certain farm he had for sale. He later told defendant that he had sold the farm but didn't have enough money to buy his land. However, in early June 1960, plaintiff again agreed to buy the farm for $6,000 and the parties met on June 9 and signed a written contract to that effect. The contract was prepared by Robert Drake at the office of the Petts Abstract Company in Warsaw.

The contract recited that plaintiff paid the $6,000 at the time of signing the contract by depositing with the abstract company a check in that amount drawn on the Farmers Bank of Lincoln, Missouri, and payable to defendant. It further provided that taxes for the calendar year in which the deed was delivered should be prorated. It contained provisions for furnishing an abstract, the examination thereof, curing title defects, transfer of insurance, and delivery of a warranty deed for the buyer at the office of the abstract company. It also recited that "time is of the essence in this contract." At the time the contract was signed plaintiff told the Kindles and Drake that he did not have the money in the bank to pay the $6,000 check but that he would have it by the time the abstract was "run up." The abstracts were brought up to date by June 20 and Mr. Drake advised plaintiff that they were ready for examination.

Defendant testified that he and his wife went to Warsaw about July 9 for the purpose of making the deed and closing the transaction; that he left his wife at the abstract office and went to look for plaintiff and found him in the rear of the post office; that he told plaintiff the abstract was ready and asked him if he was ready to finish the deal and that plaintiff replied, "The title is good, but I haven't got the money"; that plaintiff then "turned around and walked off and left me." Plaintiff's version of the conversation in the post office was that it took place on July 6, 1960; that defendant asked if he would meet him at the abstract office on July 9 and that he replied that he would probably be out of town—"and he said he wanted to complete the deal, and I said, 'You don't need me, I don't need to be there. Go and do what you have to do, because I will probably be out of town.'"

Plaintiff and defendant agree that the conversation in the post office was the last talk they had about the sale of the farm.

About July 15 defendant consulted Attorney Frank Brady in regard to his obligations under the contract with plaintiff, and on September 30, 1960, defendant and his wife conveyed the property to the Shinns for a consideration of $5,000.

Plaintiff testified that he lived in Warsaw where he was a rural mail carrier; that he owned 2,000 acres of land, a portion of which joined the Kindle farm; that he particularly wanted to buy that farm because it greatly simplified his fencing problem; that about July 15, 1960, he placed a water tank and salt trough on the farm and put 16 goats in a pasture near the buildings and two horses in another pasture; that these animals were removed several weeks later but the tank and trough remained on the farm; that he had contacted Mr. Jobe at the Farmers Bank of Lincoln and had made arrangements for the check he had delivered to the abstract company to be paid if it were presented; that he had arranged for a loan and signed a note and left it with Mr. Jobe. He stated that in 1960 his net worth was approximately $150,000.

On cross-examination plaintiff stated that he had had a lawyer examine the abstract to the farm and was advised that the title

was good; that he did not know that Mr. Shinn had rented the farm and that the house thereon had been occupied for several years after Shinn had purchased it.

The substance of plaintiff's testimony indicates that he thought he had done all that was required of him and that he assumed that the deal had been closed and that he had purchased the land; that he thought Robert Drake would accept the deed and record it and hold it for him until he needed it. His testimony is to the effect that he did not thereafter contact defendant or Drake or the bank to determine what had been done about closing the deal. He stated that he first learned in November 1962 that the farm had been sold to the Shinns and that he then employed an attorney and this suit was filed in March 1963. In regard to the taxes he stated that he did not know whether or not he had paid any taxes on this farm; that he had paid some taxes but didn't check to see whether or not his receipts covered this farm.

Billie Mac Jobe testified that in 1960 he was President of Farmers Bank at Lincoln. He stated that plaintiff had arranged with him in June 1960, before the contract was signed, to borrow $6,000 to purchase the Kindle farm; that he signed a note and the witness agreed to pay the check for the purchase price when it came in. On cross-examination this witness stated that no loan was actually made and plaintiff's account was not credited with the $6,000; that if the check came in the plaintiff was to come to the bank, after title passed, and give a deed of trust to secure the note; that he was no longer connected with the bank but that he had kept the note until he returned it to plaintiff about six months before the trial. He stated that he could have withdrawn the commitment to make the loan but that he would not have done so.

Two of plaintiff's neighbors testified that they saw the goats on the Kindle farm for a period of three or four months in the summer and fall of 1960.

In addition to the facts heretofore stated defendant testified that he had not made a deed to plaintiff because plaintiff had told him he did not have the money to pay for the land and therefore he did not obtain possession of the check and had not presented the check at the bank. He further testified that in 1958 Boyd Shinn had tried to buy the farm from him; that at that time he told Shinn that plaintiff was trying to buy it and that if plaintiff did not get the money he would give him a chance to buy it. He stated that in September 1960 he wrote Mr. Shinn to the effect that plaintiff had failed to raise the money and that he would try to sell the farm to him; that Shinn came to see him and offered him $5,000 for the farm and that he sold it to him for that price.

Robert Drake testified that he was an abstracter at Warsaw and had drawn the contract in question; that at the time the contract was signed plaintiff had said, "I don't have the money now, but I will try and get the money by the time the abstract is completed." He stated that the $6,000 check plaintiff left with him had never been out of his possession. This witness produced the check and the original of the contract at the trial and they were admitted in evidence.

At trial time Karl Kroenke was president of the bank at Lincoln. He testified that he did not know about the note plaintiff had signed but that Mr. Jobe had told him that if plaintiff's check for the purchase of the farm were presented he was to contact Jobe. Mr. Kroenke also produced the record of plaintiff's bank account. The account showed that from May 1960 until March 1961 plaintiff never had a balance of more than $2,300, and that on a number of occasions the account was overdrawn.

Boyd Shinn testified concerning his purchase of the farm and further stated that his cousin, Bob Shinn, rented the farm and moved into the house in the fall of 1960 or early spring of 1961; that he remained in the house for about a year and a

half, and then Bob rented the house to Buck Miller who occupied it for about a year; that Bob had raised about 30 acres of corn and beans on the farm in each of the years 1961, 1962, and 1963. This witness also stated that he had paid the taxes on the farm each year after he purchased it.

Buck Miller testified that he did not farm the land but had lived in the house on the farm in question (part of the time with Bob Shinn) from about October 1962 until July 1963. On cross-examination he stated that the field where the corn and beans had been planted could not be seen from the public road.

Defendants also presented the testimony of Harold Price, a farmer and banker of Warsaw, who stated that he had known plaintiff for 15 years and that his reputation for truth and veracity in the neighborhood was bad. On cross-examination this witness stated that he had had a disagreement with plaintiff over some ASC matters.

There was considerable testimony adduced concerning the issue as to whether defendants Boyd and Frances Shinn had learned of facts which would constitute notice to them that plaintiff might have some contractual right to purchase this farm at the time they bought it from the Kindles, but we have not related that testimony because our view of this case is such as to make it unnecessary to determine that issue.

■ In this equity case, "while we give due deference to the findings of the trial chancellor, we cannot escape the duty and reponsibility placed upon us to arrive at our own conclusions as to the weight and value of the evidence and determine the facts accordingly." Cruwell v. Vaughn, Mo.Sup., 353 S.W.2d 616, 624. We think it is important to first determine the facts concerning the conversation between plaintiff and defendant at the post office. We cannot defer to the trial judge in that regard. This for the reason that he evidently did not determine those facts since he expressed the view that "it was immaterial which one of

these parties was telling the truth about the conversation over at the Post Office."

■ It is definitely our view that the true facts concerning that conversation are as stated by defendant, i. e., that plaintiff said, "the title is good but I haven't got the money," and then turned and walked away. The subsequent conduct of both of said parties strongly supports that finding. It is contrary to the common experience of mankind that defendant would proceed to sell his farm to the Shinns for $5,000 if plaintiff continued to be ready, willing, and able to comply with his contract and pay him $6,000 for it. It is undisputed that defendant was anxious to sell his farm, and it is obvious that something occurred which convinced him that plaintiff (for the third time) had decided that he did not have the money to buy the land. Defendant testified that he "didn't want any trouble" so he went ahead and sold the farm to Shinn.

■ Plaintiff's conduct also supports the conclusion that he repudiated and abandoned the contract. We reject as untrue his testimony that he thought (until November 1962) that he had purchased the farm and was the owner thereof. His conduct was repugnant to any such conclusion. He did not advise Mr. Drake that the title was satisfactory and that he was authorized to deliver the check to defendant upon delivery of the deed. He did not contact Drake at any time after July 9 and inquire if the sale had been consummated, and did not take possession of the deed and abstract nor offer to pay for the recording of the deed. Both of these men lived and worked in Warsaw (a small city which we judicially know had a population of slightly more than 1,000 people) and must have seen each other frequently. If plaintiff thought Drake had closed the deal in his absence he surely would have mentioned the matter at some time during the subsequent months.

Also, we do not think plaintiff believed that the bank had actually made him a loan of $6,000 and had paid the check for the

purchase price out of his account. The agreement was that if he bought the farm he would give the bank a deed of trust on the land to secure the loan. There was never any request that he sign such an instrument and he did not do so. That fact alone should have indicated to him that the loan had not been made. Moreover, two years elapsed and he never was asked to pay any interest. That should have been a further indication that he did not owe the bank $6,000.

It is also evident from plaintiff's conduct in regard to the farm that he did not think he owned it. It is true that he had some livestock on the farm for two or three months, but it is significant that after he removed them in the fall of 1960 he apparently never rented the farm or used it in any manner from that time until he learned of Shinn's ownership two years later. During that period he did not pay taxes on the farm, or insure the buildings, and apparently paid no attention to it. Since his land adjoined the farm in question it is difficult to understand why he did not learn that the house was occupied and the land was being farmed by a tenant. Such indifference and lack of interest in an alleged $6,000 investment from a man with sufficient business ability to accumulate an estate of $150,000 is difficult to understand. It is a familiar axiom that "actions speak louder than words." We think plaintiff's actions and omissions, considered as a whole, clearly indicate that he knew he had not purchased the Kindle land.

"Courts of equity do not enforce specific performance of a contract where circumstances have arisen which makes its performance inequitable, or where there has been delay amounting to laches on the part of the plaintiff, and, as a general rule, will not grant a decree of specific performance in favor of a party who has himself once refused to perform the contract or who has been guilty of such conduct as amounts to a refusal to perform it. The reason for the rule is that one who asks a court of equity to compel the specific performance of a contract must show that he has performed, or has been able and willing to perform, all the essential terms of the contract devolving on him. The rule is based on the principle that he who seeks equity must do equity. A party cannot be permitted to violate his contract and wait until he sees that his bargain will be profitable, and then invoke the aid of a court of equity to have it executed." 49 Am.Jur. Specific Performance § 78, p. 95. See also Restatement, Contracts, § 318, p. 475, and Anno. 2 A.L.R. 416, together with the cases cited therein.

We rule that the statement and conduct of plaintiff when defendant called on him at the post office, and his subsequent acts and omissions heretofore described, constitute both a repudiation and an abandonment of the contract and he therefore is not entitled to enforce specific performance thereof.

■ Plaintiff has raised the point that questions concerning repudiation and abandonment cannot be considered on appeal because such were not mentioned in the motion for new trial. There is no merit in that contention. The motion for new trial specified that the decree was not supported by the law or the evidence. Although containing various other complaints, the words "repudiation" and "abandonment" do not appear therein. In this equitable case we consider the motion sufficient. Moreover, in a case of this nature, under Civil Rule 73.01(d), V.A.M.R., "[t]he question of the sufficiency of the evidence to support the judgment may be raised whether or not the question was raised in the trial court." It is necessary for us to consider matters relating to repudiation and abandonment in order to determine whether the evidence was sufficient to support the judgment. As indicated, this contention is overruled.

The judgment is reversed and cause remanded with directions to enter a new judgment in favor of defendants.

All concur.